UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Michael Gregg | § | |
| Plaintiff | § | |
| | § | Civil Action: H 4:18-cv-4822 |
| vs. | § | |
| | § | |
| City of Houston, | § | Jury Trial Demanded |
| Defendant | § | |
| | § | |

## Plaintiff's Original Complaint

This is a case involving co-worker harassment that frequently occurred in plain view of supervisory personnel of the City of Houston Police Department ("HPD") – but the supervisory personnel failed to perform their legal duties to safeguard employees from sexual harassment.

The harassment occurred out in the open, in the presence of many co-workers and under the eyes of various supervisors, including Sgt. Jeanette Perales, who supervised the unit for which both the plaintiff, Detective Michael Gregg, and the harasser, Officer Michelle McCormick, worked.

HPD had actual knowledge of the harassment, and that it was pervasive, and yet failed to take effective measures to stop what was occurring it and failed to take steps that would have prevented it from happening again. As a result of this negligence on the part of HPD, Gregg was subjected to regular, almost daily sexual harassment from August 2014 through September 2016. And, after Gregg made an official report of the harassment, he was subjected to unlawful retaliation: he was involuntarily transferred to a less prestigious position, lost the extra pay of being an investigator, and given less desirable shifts that affected his family life and extra jobs,

1

and he was given a false and punitive evaluation that will adversely affect his ability to compete

for jobs and affect his pay should he become an investigator again.

### Parties

1. The plaintiff, Michael Gregg, is an individual who resides in Houston, Harris County, Texas.

2. The defendant City of Houston is a municipality organized under Texas law and is located within this judicial district. Defendant is also an employer within the meaning of Sections 701(b), (g), and (h) of Title VII, 42 U.S.C. §§ 2000e(b), (g), and (h). The City of Houston may be served with process by serving the mayor of Houston, Sylvester Turner, at 900 Bagby Street, 2nd Floor, Houston, Harris County, Texas

### Jurisdiction and Venue

3. This case is brought under Title VII of the Civil Rights Act of 1964 and under 42 U.S.C. § 1983 to redress the deprivation, under color of statute, ordinance, regulation, custom or usage of rights, privileges and immunities secured to the plaintiff under the first and fourteenth amendments of the United States Constitution.

4. The Court has jurisdiction of this case under 42 U.S.C. §§ 2000e-5(f), 28 U.S.C. §§ 1331 and 1343.

5. The employment practices alleged to be unlawful were committed within the jurisdiction of the United States District Court for the Southern District of Texas, Houston Division. Therefore, venue is proper in this judicial district under 42 U.S.C. § 2000e-5(f) and 28 U.S.C. § 1391.

2

**Statement of the Plaintiff's Case**

6.    Michael Gregg is a certified law enforcement officer employed by HPD, for which he has
      worked since 2008. With the exception of the events that led him to file this litigation,
      Gregg has been well-respected by his peers and supervisors throughout his career. He has
      had over 10 years of law enforcement experience.

7.    Near the end of 2012, Gregg was assigned to work as a detective in the Criminal
      Investigation Command, Special Victims Division, Child Sexual Abuse Unit. In August
      of 2014, Officer Michelle McCormick was assigned to the same division. Shortly after
      her arrival, McCormick began making inappropriate and lewd sexual comments and
      innuendos directed towards and/or deliberately in the presence of Gregg, and she did so
      on a regular basis. On one occasion, for example, McCormick stood outside Gregg's
      cubicle with a popsicle in her mouth, thrusting the popsicle in and out of her mouth in a
      provocative way, simulating fellatio. Gregg simply turned his back to her and continued
      working. McCormick stopped by Gregg's desk practically every day and made
      inappropriate and unwelcome comments. She would turn almost every innocent remark
      into something involving sexual innuendo. Generally, Gregg tried to ignore her, or walk
      away from it if he could.

8.    This constant objectionable behavior was well-known by Gregg's co-workers and by his
      immediate supervisor, Sgt. Perales, who was also McCormick's supervisor. Perales was
      the investigative sergeant over the Child Sexual Abuse Unit. On several occasions when
      McCormick, either alone or with the active participation of Officer Sheila Sanchez,
      engaged in sexually inappropriate conduct in front of Gregg and other detectives. The

other detectives, of course, as well as their supervisor, Perales, observed the behavior. There were many occasions when, observing sexually explicit behavior by McCormick and/or Sanchez in front of Gregg and other Unit members, Perales would merely cover her field of vision (holding up papers to the side of her face) and walk swiftly by. She, in other words, made it clear to all that she just did not want to see anything that was improper.

9.  On one occasion, Perales openly acknowledged to Gregg that she knew about McCormick's misconduct, and asked him about it. In response, Gregg told her what McCormick had been and was doing both in front of and outside Perales' presence. He also informed Perales that Officer Sanchez was behaving similarly (although not directing so much of her misconduct towards him personally).

10. After that discussion with Gregg, Perales took a few ineffective steps that, Gregg assumes, were her token attempts to stop the harassment. On several occasions, Perales addressed all members of the squad together as a unit and verbally repeated something that all HPD employees knew to begin with: that sexual harassment, inappropriate comments and touching of a sexual nature were inappropriate. In terms of substance, Perales' comments did no more than parrot some of the words found in HPD's policy regarding sexual harassment, a policy with which all employees are expected to be familiar. She did not openly acknowledge the then-ongoing sexual harassment in the Unit, or try to tie the formal words of the policy to any of the specific acts of improper sexual conduct by McCormick that she and the members of the Unit had observed.

4

11.      Another ineffective step to deal with the ongoing sexual harassment was on January 27, 2015, when Perales sent an email to the entire squad with a "reminder" that sexual harassment was "inappropriate." Perales did not openly acknowledge that this inappropriate conduct was occurring in her unit. Nor did she command that it stop.

12.      Another indicator of Perales' knowledge, and ineffective actions, was her decision to add a box at the bottom of the performance evaluation forms to the effect that the officer understood the HPD sexual harassment policy – and then required that the detectives check that box as part of their self-evaluation. But, none of this was effective in stopping the sexual harassment that Gregg endured for years.

13.      Perales transferred to another HPD division in September 2015, after which Gregg was supervised by Sgt. T. Roberson and Sgt. Shaundra White. Sgt. Roberson was well aware of McCormick's behavior towards Gregg because not longer after Sgt. Perales left, Gregg and Officer Randall Kelley openly discussed it with Sgt. Roberson.

14.      Sgt. S. White was well aware of McCormick's behavior towards Gregg because he told her about it before Sgt. Perales even left the division.

**HPD Knows That Its Supervisors Are Obligated**
**To Prevent, and Halt, Unlawful Harassment**

15.      Both the City's Executive Order and HPD's Code of Conduct acknowledge an employer's legal duty to effectively stop unlawful sexual harassment and prevent further occurrences of such once the misconduct comes to the attention of a supervisor.

16.     For its part, the City of Houston Executive Order No. 1-50, Section 9, makes it mandatory for all supervisors who observe incidents of sexual harassment to (1) take prompt and appropriate action that is designed to end the harassment and (2) make a formal report of the misconduct as well. This requirement in set forth in no uncertain terms as follows:

> 9.2   <u>All supervisors</u> — Any supervisor or manager who receives a complaint of workplace or sexual harassment or other prohibited conduct or *who observes* prohibited conduct in his or her department shall take prompt and appropriate action reasonably necessary to ensure compliance with this policy. At a minimum, the supervisor or manager shall as expeditiously as possible make a report to a Designated Department Representative assigned to his or her department. ...

17.     Similarly, the Houston Police Department recognizes that its supervisors have a duty to act upon and report incidents of sexual harassment, and it brooks no exceptions. Supervisors have an affirmative duty to report instances of sexual harassment – even when the victims ask for confidentiality, which Gregg certainly never did. HPD's General Order 300-11 is equally explicit:

> Supervisors who witness, are advised of, or otherwise become aware of prohibited conduct are required to report the prohibited conduct and cannot agree to do otherwise. Once a supervisor is aware of prohibited conduct, the supervisor shall do both of the following:
>
>        a. Take immediate and appropriate action to stop and/or prevent further misconduct.
>
>        b. Promptly report the prohibited conduct to the ERS facilitator (no less than 24 hours from discovery of the incident).

18.     Perales certainly never did what the law and what her own employer required that she do
        – for all those months and months when she had actual knowledge that McCormick, at a
        minimum, was engaged in unlawful sexually harassing behavior towards Gregg. Had
        Perales taken the steps that the law and HPD's own policies require, there would be no
        doubt but that higher management too would have had actual knowledge that McCormick
        was engaged in unlawful sexual harassment of Gregg. At a minimum, higher management
        should have known of the harassment and should have done something about it long
        before September 2016.

19.     Perales should have reported McCormick's behavior to her supervisor, then-Lt. Belinda
        Null, Null's successor, Lt. Sheryl Victorian, or individuals higher up in the chain of
        command, like Captain J. Jones, Captain Evans, or Captain Dana Hitzman.

20.     Sgt. T. Roberson and Sgt. S. White, Perales' successors, also should have reported
        McCormick's behavior up the chain of command.

21.     Further, there was widespread knowledge of McCormick's sexually inappropriate
        misconduct in general and in particular towards Gregg among the members of the Unit,
        who also had a duty to report such acts.

22.     The City of Houston Executive Order 1-39 establishes an Office of Inspector General
        ("OIG") for Investigation of Employee Misconduct, and applies to a host of forms of
        misconduct, including mismanagement, conflicts of interest, ethics violations,
        discrimination and violations of state or federal law. And, each City employee who
        believes in good faith that employee misconduct has occurred or is occurring "must
        report" to the OIG the facts or circumstances giving rise to the belief.  And, HPD General

Order 300-11 provides explicitly that all officers within that Unit had a duty to report the sexual harassment they observed:

> Employees who witness prohibited conduct ... shall report the conduct immediately as described in this section.

There is little doubt, therefore, but that the City had, at a minimum, constructive knowledge of the unlawful harassment long before Gregg filed a formal complaint in October 2016.

**HPD Discourages Individual Victims from Reporting Sexual Harassment**

23.   HPD has a long history of discouraging its officers who are victims of sexual harassment from making formal complaints. This fact is well-documented in HPD's records, and case files, and even court opinions. The phenomena of discouraging officers from making complaints about the misconduct in which other officers behave is known as the Code of Silence, and its existence in HPD was first noted by the Fifth Circuit in the case of *Sharp v. City of Houston,* 164 F.3d 923, 927 (5th Cir. 1999) ("Sharp was subjected to retaliation by fellow officers for breaking t he 'code of silence,' a custom within HPD of punishing officers who complain of other officers' misconduct or who truthfully corroborate allegations of misconduct."). The Fifth Circuit again noted the Code of Silence, in which officers retaliate against those who complain, speak out against others, or file complaints – they are labeled as "snitches" and thereafter ostracized by their peers. *Zamora v. City of Houston*, 798 F.3d 326, 333-34 (5th Cir. 2015).

24.     Gregg was aware of how officers who complained of others' misconduct had been mistreated and suffered retaliation when they stood up for themselves, or for the rights of others, against other officers who were engaged in misconduct. He did not want to suffer that retaliation; he did not want to be ostracized by his peers. Besides, his own sergeant was not doing anything to stop it, and it occurred in her presence regularly.

**The Final Act of Harassment by McCormick Leading to a Formal Complaint**

25.     The event that finally led Gregg to make a formal complaint occurred on September 27, 2016, when members of the Unit were attending mandatory training. During class, someone took a picture with their phone of an officer sitting next to Gregg who had fallen asleep in the class, and texted that photo to others in the class. When she received it, McCormick held up her own phone and called out to Gregg – showing him that, on her screen, she had zoomed in on Gregg's crotch. As she held her phone screen up for Gregg and the others to see, she pointed at his crotch and made "ooh" and "ah" sounds. Several officers sitting nearby heard and saw and commented on her behavior.

26.     Later, the Unit's administrative sergeant, Sgt. Shaundra White, called Gregg into her office because, she noted, Gregg had not checked the box on the performance review acknowledging the sexual harassment policy. In response to this criticism, Gregg told S. White that she should instead be focusing on requiring that McCormick and Sanchez read up on that policy. When S. White asked Gregg to explain his comment, Gregg told her about McCormick's behavior at the training session.

27.  Hearing this, S. White ordered Gregg to make a complaint against McCormick with the office of Alternative Dispute Resolution ("ADR"). And, Gregg did as he was ordered to do. He went to the ADR office to make a complaint about the sexual harassment. After he put the incident in writing, Sgt. Lori White told him that the harassment he described fell within the category of a Class I Complaint, and would therefore have to be referred to the Internal Affairs Division ("IAD") for investigation. L. White then issued an order to Gregg: that he was to have no contact with McCormick. L. White informed Gregg that she had called McCormick on the phone and given her an order to have no contact with Gregg. After that, L. White took Gregg's statement/complaint to IAD. And, after that, McCormick was temporarily relieved of duty in the Child Sexual Abuse Unit.

28.  HPD's assessment of the complaint, even as Gregg first presented it to ADR, as a Class I Violation shows that it knew this to be a serious matter. While it later tried to downplay the seriousness of his allegations, the contemporaneous documentation reveals how it assessed the matter at the time. According to HPD General Order 300-11, a Class I Violation involves "more than mere offensive utterances or displays of discriminatory or sexually suggestive materials." If HPD viewed Gregg's complaint about nothing more than "only offensive utterances or displays of discriminatory or sexually provocative material," his complaint would have been categorized as a Class II Violation, and would not have been referred to IAD.

29.     Later, the IAD contacted Gregg and ordered him to give another statement, which he did,

informing IAD that McCormick "always made inappropriate comments" and her sexually

inappropriate behavior was "pretty common." Gregg gave IAD two more statements

about the harassment. As Gregg later became aware, IAD also took statements from

several of his co-workers, but he has been denied knowledge of their contents.

30.     HPD claims that the IAD investigation occurred between October and December 2016

and that, on March 27, 2017, McCormick was issued a seven-day suspension for "her

violations of Conduct and Behavior as well as Knowledge of and Obedience to Laws and

Rules." But, HPD has refused to divulge what that means, or why it took so long to reach

any conclusion whatsoever. What "Conduct and Behavior" does HPD contend that

McCormick violated? What is the evidentiary support for that conclusion? What did HPD

leave out of its investigation? Who did it fail to interview and what questions did it fail to

ask? On information and belief, McCormick had a troubled history of misconduct with

HPD. How much attention was paid to any pattern of behavior on her part? What earlier

notice did HPD have that McCormick had a propensity to engage in misconduct,

especially misconduct towards a fellow officer, and especially misconduct of a sexual

nature? What "Laws and Rules" did HPD conclude that McCormick violated, and what

was the basis for that? What laws and rules did HPD overlook? And why did HPD wait

until the last minute to issue any adverse finding with regard to McCormick?

31. And, while Gregg did his best to follow L. White's order to have no contact with McCormick, that proved impossible on occasion. On a day soon after both he and she were issued these no contact orders, McCormick came into the building without anyone giving Gregg any forewarning that she would be there. As required by that order, Gregg immediately reported that he had seen McCormick. And then he was forced to leave for an hour during the duration of her time in the building.

32. While the investigation was allegedly pending in IAD, the Child Sexual Abuse Unit moved into a new building – and, while McCormick was working temporarily in a different unit, she was allowed to move into the same building. This has posed a number of problems. One is that Gregg have to be extra diligent to avoid all encounters with her – not only did he wish to avoid McCormick because of the no contact order but also because Gregg feared she would use the occasion of seeing or running into him as an excuse to make up some allegation of wrongdoing on Gregg's part and Gregg would be punished on the basis of a trumped-up charge. Gregg was then told to use the back door, even though the administration knew that the key system did not work. Gregg was just told to knock really loudly so that someone might hear him. When Gregg tried that though, no one heard him and he was forced to use the main entrance. The first person Gregg saw outside the front door was McCormick. It is almost unheard of that an individual who is the subject of a "no contact" order in the HPD is allowed into the same building as the person who made the complaint, but HPD does not seem to care about that when it comes to a complaint by a man against a woman for sexual harassment.

33.     An even bigger problem is the retaliation Gregg began experiencing on the Unit. Once his complaint made it to IAD and those individuals started investigating, Gregg was considered to be a department "snitch" and most officers in the squad no longer wanted to work with him. According to Sgt. Roberson, one male officer described Gregg as a "bitch," and said Gregg was "less than a man." Most of the members of the squad now avoid him; he was no longer welcome to join the other members of the Unit when they socialized or shared lunch breaks. And, when Gregg was preparing to head out of the office to interview an adult suspect, a witness, or a juvenile, he sought another detective to accompany him, as was the common practice given the potential for violence. But, Gregg's co-workers inexplicably became unavailable, or were just "too busy," leaving him to conduct several interviews of adult suspects alone. Before, the Unit detectives always interviewed adult suspects in pairs – for obvious safety reasons.

34.     Gregg's ostracization by his peers was also shown when the Unit moved to new quarters. Before the Unit was to move, the detectives had bid on their choices of desks. But, after Gregg filed this complaint, there were people who no longer wanted to sit by him. One officer moved her desk right away saying she did not want to be involved in this "mess." The officers who did take desks near him were hostile to him and tried to avoid all interactions with him. At one point, there was a discussion of moving the desks of the officers around so that Gregg would not be surrounded by individuals who were hostile to him, but Lt. Baltazar said that this was not going to happen.

35.   Further, there were many occasions after Gregg filed the formal complaint when Lt.
Colburn made it a point to stand in front of the cubicles next to where Gregg sat at the
time speaking loudly to the group of people that sat in the nearby cubicles stating that he
had been told by a superior in the past that, "If an Officer were offended by things
deemed to be considered Sexual Harassment such as words like vagina, they needed to
get the fuck out." Colburn told that "story" several times in front of Gregg and his peers.
It was common knowledge that Captain Angelo, Lt. Colburn, and Sgt. Alvarez and other
officers in the Unit were not happy with Gregg because of their earlier personal
friendships with McCormick, and they were ready for this snitch to leave the unit.

36.   Lt. Baltazar also came up with a bizarre reason to criticize Gregg's work. One day, when
he was on call, Gregg was called to the scene where there was a juvenile victim of sexual
abuse. Afterwards, as is standard protocol, Gregg prepared his report of the incident,
which is called a "Supplemental Report." At HPD, it is typically the first officer on the
scene, usually a patrol officer, who prepares the "Original Report" of the incident, thus
leading to the designation of "Supplemental" for reports filed by other officers, like the
detectives from special units. But, out of nowhere, Lt. Baltazar criticized Gregg for not
preparing the Original Report and Sgt. Stewart then ordered him to do so. Gregg assured
Stewart that, since this was an order, he would comply, but he also explained that this
was not HPD's standard procedure, and why, but she did not seem to be satisfied with
Gregg's explanation. Ultimately, Gregg did not have to prepare the Original Report;
someone else was ordered to do it and that person was someone who was not even at the

scene. Gregg do not know why the officer who first responded to the scene did not prepare it.

### The First Official Act of Retaliation – An Involuntary Transfer

37.   On September 8, 2017, while working an overnight shift at the George R. Brown Convention Center for efforts related to Hurricane Harvey, Gregg was pulled aside by HPD's Captain Angelo. Angelo then informed Gregg that he was being transferred to the Juvenile Division effective the next day. Angelo and Lt. Colburn, who was also present, ordered Gregg to sign the involuntary transfer paperwork. The transfer document did not say who Gregg was to report to. It did have Gregg's schedule listed as 7am- 3pm. When Gregg inquired about his hours, Colburn and Angelo told him that it would be sorted out in Gregg's new division. Gregg was instructed to report to the Juvenile Division on Monday, September 11, 2017.

38.   HPD has taken the position that this was a transfer that Gregg requested. That is not an accurate depiction of the facts. Because of the retaliation and ostracization he was experiencing from his peers in the Child Sexual Abuse Unit, Gregg, though counsel, had advised  HPD that he would be willing to accept a transfer to Juvenile Investigations to get away from the retaliation in Gregg's unit – but only on a trial basis and with an opportunity to transfer back to his Unit of origin. Gregg, after all, loved the work he had been doing in that unit for years, and was only reluctantly even considering leaving it for reasons of his own mental health.

39.     Gregg soon learned that this involuntary transfer was not to Juvenile Investigations.
When he reported to Juvenile Investigations as ordered on the morning of September 11,
2017, he was met by Sgt. Teel, who said that Gregg was not assigned to Juvenile
Investigations, but instead to Juvenile Intake. Gregg then reported to Juvenile Intake and,
after a while, met with Sgt. Rojas. Rojas was surprised, and remarked that he had no
knowledge of Gregg being assigned to Juvenile Intake and was unsure as to where Gregg
was supposed to report. Rojas then spoke to his superiors and told me that Gregg would
indeed be assigned to Intake.

40.     Gregg stayed in Juvenile Intake until around close of the day shift, but then received an
email to come back to the Child Sexual Abuse Unit to close out cases he had been
working on at the time he was given this involuntary transfer order. If Gregg had been
given advance notice of a transfer, he of course would have had time to better organize
his files, complete some tasks, and then hand the files off to someone else. HPD General
Order 300-02, in fact, provides that he should have been given at least ten calendar days'
notice before then transfer would become effective. But, Gregg was not provided that
courtesy. Still, as ordered, Gregg returned to his unit of origin and worked three days
trying to close out cases. After a week off, he was again ordered to return to his unit of
origin, and was told that he had one final day to try to close out his previous cases. Gregg
did as he was told, closed out as much as he could, and left notes on items remaining to
be done. On September 27, 2017, Gregg reported back to intake and was told he would be
working the 3p-11p evening shift with Tuesdays/Wednesdays off.

41.     Juvenile Intake is a step down from investigations in many ways. First, it's not as challenging, not as desirable, not as prestigious a position – it's not even an investigator's position. Intake has traditionally been a place where officers were sent when they were in trouble or ranked low in their academy's classes and are involuntarily transferred there to fill positions. It has been a place where few want to work and that remains to be the case.

42.     This involuntary transfer meant not only a loss in status, but also a loss in income. First, Gregg lost the additional pay he had been receiving as an investigator for years; members of the Juvenile Intake Unit are not considered as, and not paid as, investigators. Additionally, since August 2012, Gregg had sufficient seniority as an investigator in the Child Sexual Abuse Unit that he was assigned to a day shift position with weekends off. In the Juvenile Intake Unit, Gregg no longer had those benefits – he lost the day shift and weekends off, which has adversely impacted Gregg's family life and his availability to work extra jobs, and thus bring in additional income for his family.

**The Second Formal Act of Retaliation by HPD**

43.     On October 20, 2017, Gregg's current lieutenant called him into his office and handed him a document he said he had found on a sergeant's desk, which is a "Report of Employee Efficiency Rating," Gregg's six-month review. It had already been signed by Gregg's former sergeant, Sgt. Jessica Alvarez in the Child Sexual Abuse Unit, and was dated October 12, 2017. Gregg does not recognize the second signature on the document.

44.     This Efficiency Rating is supposed to cover the six-month period ended August 31, 2017.

It contains false assertions of fact and is the lowest Gregg had received in 8 years. First, it

falsely stated that Gregg was one of the lowest producers in the Unit. That was not true.

Gregg had about 28-30 cases when the Summer of 2017, which was not much different

than the work load of most detectives in the Unit. But, because of the psychological

impact of the retaliation that he began suffering after making a formal complaint against a

fellow officer, Gregg began seeing a psychologist employed by HPD. The psychologist

recommended that, to give Gregg time to deal with the impact of the retaliation, he be

given "light duty" for 45 days. HPD took that term and unilaterally interpreted it to mean

that Gregg's case load should be cut in half, which it proceeded to do.  And so, in June

2017, Gregg was suddenly ordered to hand over about half of his open, active case files,

some of which were almost completed. As those files closed, other detectives got the

credit for it – even though Gregg may have done the vast majority of the work. Further, it

was HPD's decision, not that of Gregg, that, when Gregg thereafter closed any files, he

was not assigned any new ones. Nor were his case assignments increased after the

passage of the recommended 45 days of "light duty." Again, that was a decision made by

HPD, not by Gregg.

45.     The report falsely states that Gregg had only two cases assigned to him. The

contemporaneous emails Alvarez sent to Gregg after his involuntary transfer proves that

this number is false. And Gregg was also still checking on cases that had been

inactivated. The report is also false in reporting that Gregg had only one arrest and one

charge in the entire six months. Again, Alvarez's own emails show that what she wrote in

this efficiency report is false. She herself identifies three specific cases in which charges were authorized in mid August alone, showing the work was done.

46.     While this report also criticizes Gregg's timing on filing warrants, neither his timing nor his practice was atypical of the detectives in the Unit. In fact, after Gregg was transferred, the lieutenant over the squad admonished the remaining members to start filing their warrants more quickly than they had been doing – and not "wait weeks" to file them, as they had previously been doing.

47.     The report also wrongly accuses Gregg of mishandling witness statements. That is absolutely untrue, as HPD knows. When Gregg was involuntarily transferred, Alvarez went to Gregg's desk and gathered up all his files: the active ones, some technically inactive files on which Gregg was still checking, and some awaiting transfer to storage. All that was done without Gregg's knowledge, consent, or participation. After doing that, Alvarez accused Gregg of not having copies of the witness interviews in some of the case files, which Gregg knew was wrong. Gregg had, pursuant to normal procedures, made copies of recorded witness interviews and transferred them to disks to put in the case files. What happened to those copies when Alvarez took everything off Gregg's desk, Gregg doesn't know. But, as Gregg told Alvarez, the originals of those recorded statements were on Gregg's voice recorder, which Gregg had been required to surrender when he was transferred. Fortunately, the administration retrieved that voice recorder, gave it to Gregg, and he found, to his great relief, that no one had erased the contents of the voice recorder yet. The originals of the witness statements were still on the recorder and so he once more copied them, and gave this set of copies to Alvarez.

48.     As a result of this wrongfully lowered efficiency rating, Gregg's ability to be competitive in applying for transfers to a more desirable position will be harmed. And, even assuming Gregg is allowed to once again be an investigator, this rating will lower the amount of additional pay Gregg will receive for that assignment.

### Exhaustion of Administrative Remedies

49.     Gregg timely filed a charge of discrimination with the Equal Employment Opportunity Commission regarding the sexual harassment he endured. The harassment, as he explained in his Charge, occurred over a period of slightly over two years, with the last incident being in September 2016. He filed his Charge complaining of that harassment on or about March 31, 2017, which is well within 300 days of the last component act that constitutes the unlawful harassment. Gregg also timely filed two supplemental charges of discrimination – one on or about November 14, 2017, complaining of the involuntary transfer that took effect two months earlier, and the second on December 5, 2017, after receipt of the false and derogatory performance evaluation in October. After over 180 days passed, Gregg requested a right-to-sue letter. Gregg received a right-to-sue letter, and timely files this complaint.

## CAUSES OF ACTION

### Statutory Violations: Sexual Harassment and Retaliation

50.     The City is liable for the sexual harassment Gregg endured from his co-worker because, despite the fact that supervisory-level personnel knew of the harassment, they failed to stop it. It is also liable for the acts of retaliation that were taken against him because he filed a formal complaint.

51.     The City's conduct violates Title VII of the Civil Rights Act of 1964, which prohibits discrimination in employment on the basis of gender, and retaliation against an individual for reporting and objecting to such discrimination.

### Constitutional Violations

52.     The City's conduct also violates 42 U.S.C. §1983, which prohibits deprivation, under color of statute, ordinance, regulation, custom or usage of rights, privileges, or immunities secured by the constitution and law.

53.     The City's conduct violates the first amendment of the United States Constitution, which prohibits retaliation against an individual for engaging in protected speech, and the fourteen amendment, which guarantees equal protection of the law. A complaint of sexual harassment is protected speech.

**DAMAGES**

54.     The City's actions caused economic damages to Gregg in the form of lost wages and benefits income, past and future.

55.     The City's actions also caused Gregg compensatory damages; he has experienced the type of mental anguish, embarrassment, anger, frustration, disappointment, regret, despair, and disruption of his peace of mind as a result of Defendant's unlawful conduct which any reasonable person would have suffered under like circumstances. He has also suffered compensable out-of-pocket expenses as a direct result of having been unlawfully retaliated against by the City with regard to his transfer.

**RELIEF REQUESTED**

The plaintiff asks this court to enter a judgment:

a.      Declaring that the acts and practices complained of in this Complaint are in violation of the law;

b.      Enjoining and permanently restraining these violations of the law;

c.      Declaring that the acts and practices complained of in this Complaint are in violation of the United States Constitution;

d.      Enjoining and permanently restraining these Constitutional violations;

e.      Directing the defendant to pay plaintiff actual and compensatory damages that he suffered, past and future;

f.      Awarding plaintiff pre-judgment interest on the amounts owed at the maximum rate allowed by law;

g.       Awarding plaintiff the costs of this action, together with reasonable attorneys' fees

and expert witness fees;

h.       Awarding plaintiff post-judgment interest on the amount of judgment until paid at

the maximum rate allowed by law; and

i.       Awarding plaintiff such other relief, legal or equitable, as may be warranted.

Respectfully submitted,

   /s/ Margaret A. Harris
Margaret A. Harris*
Southern Dist. ID 87
State Bar No. 09081400
Paul R. Harris
State Bar No. 24059905
S.D. Tx. No. 897365
Butler & Harris
1007 Heights Boulevard
Houston, Texas  77008
(713) 526-5677
(888) 370-5038 (fax)
margie@butlerharris.com
paul@butlerharris.com

* Attorney in charge for the Plaintiff
Michael Gregg

23