UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Michael Gregg | § | |
| Plaintiff | § | |
| | § | Civil Action: H 4:18-cv-4822 |
| vs. | § | |
| | § | |
| City of Houston, | § | Jury Trial Demanded |
| Defendant | § | |
| | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

**I. Summary of the Argument** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**II. Rule 56 Standards Warrant a Jury Trial** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**III. Statement of Facts** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    **A. The Existence and Frequency of the Sexually Inappropriate Conduct Toward Gregg** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    **B. Management Knew About, But Failed to Stop the Harassment** . . . . . . . . . . . . . 10

    **C. Gregg's Formal Complaint and the Belated Removal of McCormick** . . . . . . . . 13

    **D. HPD's "Investigation" by IAD–An Intimidating, But Wholly Inadequate, Response** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    **E. Hostility from Co-Workers After the Complaint** . . . . . . . . . . . . . . . . . . . . . . . . 16

    **F. The Impact on Gregg and His Case Load** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

    **G. The Involuntary Transfer to a Much Less Desirable Position, and Its Impact** . . 19

    **H. The Derogatory and False Review** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**IV. Argument and Authorities** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

    **A. Genuine Issues of Material Fact Requires a Jury's Assessment of Gregg's Retaliation Claims** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    **B. The Retaliation Claim Requires a Jury Trial** . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        1. Gregg's Protected Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        2. The City Took Material Adverse Actions Against Gregg . . . . . . . . . . . . . . . 30

        3. The Causal Link Between Gregg's Protected Activity and the Materially Adverse Actions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

        4. The Temporal Proximity of the Retaliatory Conduct . . . . . . . . . . . . . . . . . . 35

**C. The City Is Liable for the Sexual Harassment That Gregg Endured** . . . . . . . . . 36

    <u>1. The Sexual Harassment Was Sufficiently Severe or Pervasive</u> . . . . . . . . . . . 37

    <u>2. The City Was Negligent and Is Thus Liable</u> . . . . . . . . . . . . . . . . . . . . . . . 39

    <u>3. The Sexual Harassment Claim is Not Time-Barred</u> . . . . . . . . . . . . . . . . . . . 42

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

TABLE OF AUTHORITIES

## CASES

*Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473 (5th Cir. 2008)

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6

*Berry v. Stevinson Chevrolet*, 74 F.3d 980 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Boehms v. Crowell*, 139 F.3d 452 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Bosque v. Starr Cty.*, 630 Fed. App'x 300 (5th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31, 32

*Brady v. Houston Indep. Sch. Dist.*, 113 F.3d 1419 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 31

*Brawner v. City of Richardson, Tex.*, 855 F.2d 187 (5th Cir.1988) . . . . . . . . . . . . . . . . . . . . . . 30

*Burlington Industries v. Ellerth*, 524 U.S. 742 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405 (2006) . . . . . . . . . 4, 28

*Click v. Copeland*, 970 F.2d 106 (5th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 38

*Davis v. Fort Bend Cnty.*, 765 F.3d 480 (5th Cir.2014), *cert. denied*, 135 S.Ct. 2804 (2015) . . 27

*Donaldson v. CDB Inc.*, 335 F. App'x 494 (5th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Evans v. City of Houston*, 246 F.3d 344 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Faragher v. City of Boca Raton*, 524 U.S. 775 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803 (5th Cir.1996) . . . . . . . . . . . . . . . . . . . 34

*Gee v Principi*, 289 F.3d 342 (5th Cir.2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Ginger v. District of Columbia*, 527 F.3d 1340 (D.C. Cir. 2008)

*Harris v. Forklift Sys.*, 510 U.S. 17 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Haverda v. Hays Cty.*, 723 F.3d 586 (5th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

iv

*Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224 (5th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . 6

*Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . .

*Johnson v. Halstead*, 916 F.3d 410 (5th Cir. 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Jones v. Flagship Int'l*, 793 F.2d 714 (5th Cir.1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Kreuzer v. City of Houston*, Civil Action No. H-03-5073 (S.D.Tex 2005), *aff'd without opinion* (5th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

*Laxton v. Gap Inc.*, 333 F.3d 572 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *32*

*Luckie v. Ameritech Corp.*, 389 F.3d 708 (7th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Melvin v. Barr Roofing Co.*, 806 F. App'x 301 (5th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . 27, 33

*Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Mooney v. Lafayette County School Dist.*, 528 Fed.App'x. 447 (5th Cir. 2013) . . . . . . . . . . . . 31

*Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871 (5th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Nash v. Electrospace Sys., Inc.*, 9 F.3d 401 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*Nat'l RR Passenger Corp. v. Morgan*. 536 U.S. 101 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669 (1983) . . . . . . . . . . . . . 33

*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998) . . . . . . . . . . . . . . . . . . . . . . . . 33

*Pickering v. Board of Education,* 391 U.S. 563 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Raggs v. Miss. Power & Light Co.*, 278 F.3d 463 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . 27

*Ramsey v. Henderson*, 286 F.3d 264 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000) . . . . . . . . . . . . . . . . . . . . . 6

*Rivera-Rivera v. Medina & Medina, Inc.,* 898 F.3d 77 (1st Cir. 2018) . . . . . . . . . . . . . . . . . . . 5

*Rochon v. Gonzales*, 438 F.3d 1211 (D.C. Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Sharp v. City of Houston*, 164 F.3d 923 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 36

*Smith v. Chicago Bridge & Iron Co., N.V.*, 2017 WL 2619342 (S.D. Tex. June 16, 2017) . . . . 31

*Vojvodich v. Lopez*, 48 F.3d 879 (5th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Waltman v. International Paper*, 875 F.2d 468 (5th Cir.1989) . . . . . . . . . . . . . . . . . . . . . . 36, 37

*Washington v. Ill. Dep't of Revenue*, 420 F.3d 658 (7th Cir. 2005)

*Webb v. Round Rock Indep. Sch. Dist.*, 595 F. App'x 301 (5th Cir. 2014) . . . . . . . . . . . . . . . . 29

*Weeks v. NationsBank, N.A.*, 2000 WL 341257 (N.D. Tex. 2000) . . . . . . . . . . . . . . . . . . . . . . 35

*West v. City of Houston, Texas*, 960 F.3d 736 (5th Cir. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Wheat v. Fla. Par. Juvenile Justice Comm'n*, 811 F.3d 702 (5th Cir. 2016) . . . . . . . . . . . . . . . 27

*Williamson v. City of Houston,* 148 F.3d 462 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 1, 2, 4, 36

*Young v. United Parcel Serv., Inc.,* 135 S. Ct. 1338 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Zamora v. City of Houston,* 798 F.3d 326 (5th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

**STATUTES**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a) . . . . . . . . . . . . . . . . . . . . . . . 27

vi

| Exhibit | Description |
|---|---|
| 1 | Documents Produced by City of Houston |
| 1-A | HPD General Order 300-11–Subject: Discrimination, Harassment, and Other Prohibited Conduct (Issue Date September 9, 2010). |
| 1-B | HPD General Order 200-03–Subject: Investigation of Employee Misconduct (dated March 1, 2011) [COH/Gregg000103-000110] |
| 1-C | City of Houston Executive Order 1-50, Effective Date: April 6, 2012 [COH/Gregg000096-000101] |
| 1-D | Emails exchanged between Lt. Colburn and Gregg on July 20, 2017 [COH/Gregg000102] |
| 1-E | July 17, 2017, email from Capt. David Angelo to Ann Spiegel re: Michael Gregg Light Duty Request Letter  [COH/Gregg000075] |
| 1-F | July 25, 2017, emails between Lt. John Colburn and Capt. David Angelo re: Officer Gregg  [COH/Gregg000073] |
| I-G | Emails between Capt. Angelo and Ann Spiegel re: Gregg's involuntary transfer, September 8, 2017 [COH/Gregg000077-000078] |
| 1-H | Emails between Capt. Angelo and Capt. Lentini (Juvenile Division) re: Gregg September 12, 2017 [COH/Gregg000079-000080] |
| I-J | Documents from IAD file on Gregg's Complaint of Sexual Harassment [filed under seal] |
| 2 | Declaration of Michael Gregg |
| 2-A | Email Perales to Unit January 27, 2015, re: Prohibited Conduct [COH000936-937] |
| 2-B | Michael Gregg EEOC Charges (original, first supplemental, and second supplemental) |
| 2-C | Photo from Training Session on September 27, 2016 [Gregg00003] |
| 2-D | Email Roberson to CSAU investigators April 25, 2017 re: Interviewing Subjects/Officer Safety [Gregg000029] |
| 2-E | Gregg Statement to ADR, October 3, 2016 [COH/Gregg000068-000069] |

| 2-F | Gregg First IAD Statement, October 3, 2016 [COH/Gregg000648] |
|-----|---------------------------------------------------------------|
| 2-G | Gregg Second IAD Statement, October 10, 2016 [COH/Gregg000704-000706] |
| 2-H | Gregg Third IAD Statement, October 13, 2016 [COH/Gregg000713-714] |
| 2-I | Email Perales to CSAU investigators dated April 28, 2015 re: Sexual Harassment and Other Prohibited Conduct (w/ attachment, HPD Circular No. 13-1016-273) (City Doc. # 005212). |
| 2-J | Memo from Meagan Houston, Ph.D, HPD Psychological Services Division, to Sgt. Shandra White dated May 31, 2017 re: Michael Gregg and light duty [COH/Gregg000247] |
| 2-K | Email exchanges between Sgt. Alvarez and Michael Gregg September 12, 2017 re: Open Cases [COH/Gregg000088-000090] |
| 2-L | Email exchanges between CSAU supervisors and Juvenile Intake supervisors September 12, 2017 re: Officer Gregg [COH/Gregg000081-000082, 000087] |
| 2-M | Email from Lt. Colburn to CSAU investigators and sergeants September 12, 2017 re: charges [Gregg000041] |
| 2-N | Email from Lt. Colburn to CSAU investigators and sergeants September 13, 2017 re: inactive cases [Gregg000042] |
| 2-O | Involuntary Transfer Paperwork (to Juvenile Division effective 09/09/17) [Gregg000033] |
| 2-P | Gregg Witness Statement in Separate IAD Investigation, January 10, 2018 [Gregg000075] |
| 2-Q | Notes of Dr. Meagan Houston, HPD Psychological Services, March 17, 2017 re: Michael Gregg [Gregg000819] |
| 2-R | Report of Employee Efficiency Rating for Michael Gregg, August 31, 2017 |
| 3 | Declaration of Margaret A. Harris |
| 3-A | Emails exchanged between M. Harris, counsel for the plaintiff, and C. Sandmann, counsel for the City, dated July 11, 2017, and August 7, 2017 |
| 3-B | Emails exchanged between M. Harris, counsel for the plaintiff, and A. Spiegel, counsel for the City, dated August 14 & 16, 2017 |
| 4 | Deposition Transcript of HPD 30(b)(6) Witness (Lt. B. Morefield) (October 22, 2019 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| Michael Gregg | § | |
| Plaintiff | § | |
| | § | Civil Action: H 4:18-cv-4822 |
| vs. | § | |
| | § | |
| City of Houston, | § | Jury Trial Demanded |
| Defendant | § | |
| | § | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Contrary to the City's arguments, there are genuine issues of material fact that require a jury's assessment of the evidence in this case. And the evidence that police officer Michael Gregg has to offer in a trial is such that, under well-established law, a reasonable jury could find the City liable for both the sexual harassment to which he was subjected for two years and for the retaliation he suffered once he presented his sexual harassment complaint to the Internal Affairs Division.

Michael Gregg, who once held an investigator's position in the prestigious Child Sexual Assault Unit, is not the first HPD law enforcement officer who endured months and months of sexual harassment, and whose supervisor knew or should have known about the misconduct but failed to stop it. No fewer than three Houston-area juries have found HPD liable for the sexual harassment that HPD knowingly allowed to continue for agonizingly long periods of time.[1]

---

[1] *See Williamson v. City of Houston,* 148 F.3d 462 (5th Cir. 1998) (affirming jury verdict for sexual harassment and retaliation) (female officer sexually harassed by male co-worker for 18 months; the supervising sergeant had actual and constructive knowledge of the harassment but filed to stop it); *Sharp v. City of Houston,* 164 F.3d 923, 931 (5th Cir. 1999) (affirming jury verdict for sexual harassment and retaliation) (female officer sexually harassed by her sergeant and lieutenant; City found liable because the harassers' supervisor had constructive knowledge of

1

Nor is Gregg the first HPD police officer who suffered from retaliation, including co-workers' acts ranging from shunning and ostracism to acts that jeopardized officer safety, as well as his involuntary transfer from an elite to a much less prestigious unit.[2] The juries in these three sexual harassment cases also rendered verdicts in the plaintiffs' favor for the retaliation they suffered after their opposition to their unlawful treatment was formalized–retaliation stemming from the phenomena known as the Code of Silence. Linda Williamson, for example, was involuntarily transferred from a prestigious position in the Organized Crime Squad to the Research and Analysis Squad.[3] Patrice Sharp was shunned, badmouthed, and socially ostracized by her co-workers; the tack on her horse was vandalized in such a way that she could have been injured; her co-workers failed to quickly come to her aid when she was in an accident; and HPD transferred her from the elite Mounted Patrol to a teaching post at the Police Academy.[4]

---

the harassment but failed to intervene and stop the harassment); *Kreuzer v. City of Houston*, Civil Action No. H-03-5073 (SDTX 2005) (jury verdict for sexual harassment and retaliation), *aff'd without opinion* (5th Cir. 2006).

[2] *Williamson*, *supra*; *Sharp*, *supra*.; *Kreuzer*, *supra*; *see also Zamora v. City of Houston,* 798 F.3d 326, 329 (5th Cir. 2015) (affirming jury verdict for police officer who suffered retaliation by being transferred out of the department's prestigious Crime Reduction Unit because his protected activity under Title VII).

[3] *Williamson v. City of Houston,* 148 F.3d 462 (5th Cir. 1998) (affirming jury verdict for sexual harassment and retaliation).

[4] *Sharp v. City of Houston*, 164 F.3d at 934 (evidence supported jury's verdict of retaliation–that the retaliatory acts by Sharp's co-workers and her transfer–even though formally labeled as "voluntary"–was a constructive demotion).

2

Federal juries also found that police officers Beth Kreuzer, a motorcycle officer,[5] and Christopher Zamora, an officer with the Crime Reduction Unit, suffered actionable retaliation after their opposition to unlawful discrimination became known to their colleagues.[6] Curiously, despite being told by these juries that HPD has a problem with the Code of Silence that operates to punish officers who speak out about others' misconduct, HPD does not acknowledge that problem, and does nothing to train its officers to do the right thing.[7]

## I. Summary of the Argument

The City's argument that a jury should not hear this case is based on misstatements of the law, and a failure to acknowledge the evidence that supports Gregg's claims and could support a jury verdict in his favor.

First, Gregg can present substantial evidence to a jury that the sexual harassment he endured was frequent (almost daily), prolonged (lasting two years), unwelcome, because of his gender (male), humiliating, and both subjectively and objectively unreasonable. And, contrary to the City's argument, he has evidence that his supervisor was well-aware of that harassment and yet failed to take effective action to stop it, despite her legal duty to do so. The City is incorrect to argue that he needs evidence that any one act of harassment was "severe," or that it destroyed

---

[5] *Kreuzer v. City of Houston*, Civil Action No. H-03-5073 (S.D. Tex. 2005), jury verdict for plaintiff for sexual harassment and retaliation *aff'd without opinion* (5th Cir. 2006)

[6] *Zamora v. City of Houston,* 798 F.3d 326, 329 (5th Cir. 2015) (affirming jury verdict for police officer who suffered retaliation by being transferred out of the department's prestigious Crime Reduction Unit because his father, another officer, had filed a discrimination suit against the department, which he later joined).

[7] Exhibit 5 (Deposition of HPD 30(b)(6) Witness, Lt. Morefield) at internal pages 9, 13-15, 130-131.

3

his ability to perform his job as an investigator. Despite the City's assertion, it is not necessary that Gregg present evidence that McCormick's misconduct made his working environment psychologically injurious–he need show only that her sexually inappropriate conduct would be, and was, perceived as hostile or abusive.[8] And, the incidents cannot be looked at in isolation. The totality of the employment circumstances determines whether an environment is objectively hostile.[9]

While the City relies heavily on a recent decision finding that it was not liable for sexual harassment of a firefighter,[10] that plaintiff, unlike Gregg, could not show that the harassment was pervasive; she admitted that the specific acts to which she took exception were isolated and/or infrequent–once a subordinate threw a bag at her, she twice discovered her fellow firefighters asleep in their underwear, and only "occasionally" saw her coworkers grab themselves at the dinner table. As to the other acts–her male colleagues passed gas, burped, left adult magazines in the common areas, she offered no evidence whatsoever as to the frequency of other misconduct.[11] A similar problem resulted in summary judgment for the employer in another case on which the City relies[12] because the plaintiff "did not even estimate how many times [the] conduct occurred."[13] On the other hand, the Fifth Circuit found evidence that the harassment was

---

[8] *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 22, 114 S. Ct. 367, 371 (1993).

[9] *West v. City of Houston*, 960 F.3d 736, 742 (5th Cir. 2020).

[10] *West v. City of Houston*, 960 F.3d 736 (5th Cir. 2020).

[11] *West*, 960 F.3d at 739, 742.

[12] *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317 (5th Cir. 2004).

[13] *Hockman v. Westward Commc'ns, LLC*, 407 F.3d at 328.

4

sufficiently pervasive when the plaintiff testified that it was described as "two or three times a week."[14]

Second, Gregg can present substantial evidence to a jury that his supervisor knew of the sexual harassment and yet failed to stop it,[15] which would be sufficient to support a jury's verdict in his favor for the sexual harassment.[16] HPD, in fact, has often stated that its supervisors have an absolute duty to take affirmative action to stop sexual harassment whenever it is reported to them, or they see it, or they otherwise become aware of it.[17]

Third, Gregg can present evidence that the retaliation he suffered occurred because he reported the sexual harassment to the IAD and that the retaliatory acts were sufficiently harmful that they would dissuade a reasonable officer from reporting similar acts of harassment.[18] That evidence includes persistent and mean spirited acts of retaliation by his co-workers that went on for months and included refusals to assist him when assistance was otherwise commonly provided out of concerns for officer safety. And the evidence is that the unit to which he was

---

[14] *Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 806 (5th Cir. 1996)

[15] Exhibit 2 at 5-7, ¶¶ 10-14; *see also* Dkt. 29-1 (Deposition of Michael Gregg, attached to Defendant's Motion for Summary Judgment) at internal pages 48-51.

[16] *See, e.g.*, *Williamson*, 148 F.3d at 465 (evidence that the plaintiff told her sergeant, that the sergeant had personally observed it, and that the harassment was so open that the sergeant was aware or should have been aware of it was sufficient to support jury verdict of the City's liability for unlawful sexual harassment; the jury was entitled to disbelieve the sergeant's testimony that he lacked knowledge).

[17] *See, e.g.*, Exhibit 1, Attachment A (General Order 300-11–Subject: Discrimination, Harassment, and Other Prohibited Conduct at internal page 7 (Section 6, *Reporting Procedures*)).

[18] *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405 (2006).

5

involuntarily transferred is objectively much less prestigious than was his assignment as an investigator in the Child Sexual Assault Unit, and that the assignment cost him thousands of dollars. He also has evidence that the transfer to that position was directly linked to his sexual harassment claim–because it would not have occurred but for his refusal to dismiss that claim in exchange for a comparable, similarly prestigious, and mutually-satisfactory position. Finally, Gregg has evidence that the derogatory and false performance review his sergeant issued after the involuntary transfer could have had a serious and detrimental impact on his future with HPD.

## II. Rule 56 Standards Warrant a Jury Trial

Rule 56 of the Federal Rules of Civil Procedure states:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.

A striking example of a genuine issue of fact in this case is whether Gregg's supervisor, Sgt. Perales, knew of the sexual harassment to which Gregg was being subjected. If she did, as Gregg's evidence shows, the City would be liable because she knew about it but failed to stop it. Whether to believe Gregg's testimony regarding Sgt. Perales' knowledge requires a fact-finders' assessment and that is not a role the Court can assume in summary judgment proceedings; a summary judgment, after all, may not be based on credibility determinations.[19]

Instead, the question is whether the movant has shown that there are no genuine issues of material fact.[20] When one considers the evidence that Gregg can present to a jury, it is obvious

---

[19] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254 (1986).

[20] *Anderson,* 477 U.S. at 249 ("[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."); *see also Rivera-Rivera v. Medina & Medina, Inc.,* 898 F.3d 77, 84 (1st Cir. 2018) ("When it

that the City, as the movant here, cannot meet its burden to show that the evidence "is so one-sided that [it] must prevail as a matter of law."[21]

The law also requires that, in viewing the evidence, a Court must view it in the light most favorable to the non-movant,[22] Gregg. In its motion, however, the City ignores that well-settled law and either ignores or misstates the evidence Gregg can present to a jury in support of his claims. His supervisor's knowledge is one example. Another is the evidence that ties the retaliation of which Gregg complains directly to his sexual harassment complaint, including emails authored by its top personnel. The City also ignores the requirement that summary judgments be supported admissible evidence, not conclusory assertions based on speculation and hearsay, or otherwise outside the affiant's personal knowledge.[23] It tells the Court, for example, that the performance review of which Gregg complains in not in his personnel file–but it offers no evidence. And, given the signatures of his former supervisors on the document, as well as the evidence that they provided it to Gregg's new unit, a jury would be more than reasonable to reject that conclusory, self-serving argument.

---

comes to evaluating summary judgment motions, judges simply aren't meant to be factfinders. In what should come as a surprise to no one, then, courts should never be in the business of granting such motions when the case's material facts are genuinely disputed by the parties.")

[21] *Anderson v. Liberty Lobby*, 477 U.S. at 250.

[22] *Heinsohn v. Carabin & Shaw, P.C.*, 832 F.3d 224, 245 (5th Cir. 2016) (district court erred in favoring employer's statements and rejecting the plaintiff-employee's statement; "To hold otherwise would signal that an employee's account could never prevail over an employer's. This would render an employee's protections against discrimination meaningless.")

[23] *See Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000) ("[T]he court must disregard all evidence favorable to the moving party that the jury is not required to believe, ... [unless] the moving party['s evidence] is uncontradicted and unimpeached.") (*citing Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 151 (2000)).

### III. Statement of Facts, Including Genuine Issues of Material Facts

Some facts are undisputed. Michael Gregg is a certified law enforcement officer employed by HPD, for which he has worked since 2008. In 2012, Gregg applied for, and was accepted into an investigator's position in the Child Sexual Abuse Unit ("CSAU").[24] As an investigator, Gregg to investigated allegations of child sexual abuse–whether filed by the victim, a family member, an educator, or was otherwise brought to the attention of the Houston Police Department. These investigations involved interviewing witnesses, ferreting out inconsistencies or falsehoods, examining documents, including files involving the accused and/or third parties, and connecting the dots. Some cases were relatively easy to complete and could be handed over to the district attorney's office in short order; some, however, took months to work up–witnesses went missing, files were unavailable, or other problems (including each investigator's need to triage the cases to which they were assigned).[25]And some just had to be closed because there was insufficient evidence to show even probable cause.[26]

During the majority of his time with this unit, Gregg was considered one of the top investigators by both his supervisors and his peers.[27] He was honored to be asked to present at the Police Academy, and he was one of the few investigators assigned the responsibility of supervising interns.[28]

---

[24] Exhibit 2 at 1.

[25] *Id*. at 2.

[26] *Id*. at 2.

[27] *Id*. at 2.

[28] *Id*. at 2.

In April 2013, Sgt. Jeanette Perales became Gregg's supervisor in CSAU and, when Michelle McCormick joined the unit as an investigator in August 2014, Perales was her supervisor as well.[29] Also undisputed is the fact that, in early October 2016, Gregg made a formal complaint of sexual harassment against McCormick and IAD began sending copies of Gregg's complaint to his co-workers, giving them 48 hours to provide, in writing, answers to specific questions posed to them by the investigator. Very few of the factual issues at the core of Gregg's claims, however, are undisputed.

**A. The Existence and Frequency of the Sexually Inappropriate Conduct Toward Gregg**

While the City disagrees, Gregg has evidence that McCormick began engaging in sexually inappropriate conduct toward and directing offensive sexual comments to him without delay–and that misconduct continued on an almost daily basis for the next two years. Here are some examples of the evidence that Gregg would show a jury:

> • McCormick routinely made a point of getting Gregg's attention when she walked by and then, having done so, she would pointedly leer at his crotch. At times, she did not say a single word; at other times, she would make only a sound, like "umph."

> • McCormick often walked directly up to Gregg as he sat at his desk and briefly rubbed his shoulders and neck area before walking away.

> • McCormick frequently made comments or statements of a sexual or vulgar nature. She has a unique ability to turn even the most innocuous of comments into sexual innuendo. In one conversation, for example, Gregg mentioned a knob, like a door knob. Immediately, McCormick said, "I bet you like getting your knob twisted."

> • Gregg was on the elevator with McCormick at the end of a day and the elevator was almost full with students from the Kaplan training school, which shared the building. It was a small elevator and Gregg was at the back of the elevator.

---

[29] Dkt. 6 (Defendant City of Houston's Answer) at 1.

McCormick, acting as though she was simply making room for the students, backed up close to him and, with one hand behind her back, she rubbed his body from mid-thigh up to near his groin/crotch area, and smiled.

• McCormick stood at Gregg's cubicle and simulated oral sex/fellatio on a Popsicle, gagging and making sure he could see her getting the complete popsicle in her mouth.

• Gregg was standing in his cubicle yawning and stretching and he was wearing an untucked shirt. Walking by, McCormick reached out her hand and touched his belly button/stomach (skin to skin).

• On 9/27/16, members of the squad were attending mandatory training and someone took a picture with their phone of an officer sitting next to Gregg, who had his eyes closed, and texted it to others in the training. McCormick held up her phone and called out to Gregg with the picture zoomed in on his crotch. She was pointing to his crotch and making ooh and ah sounds. Several officers sitting nearby heard and saw and commented on her behavior.[30]

As Gregg would explain to the jury, the frequency of McCormick's misconduct was facilitated by the fact that the easiest route to and from her desk was right by that occupied by Gregg.[31]

## B. Management Knew About, But Failed to Stop, the Harassment

Gregg will also offer the jury evidence that McCormick was not taking particular care to ensure that her misconduct went unobserved. He can offer evidence that HPD supervisors knew of her sexual harassment, and that other officers told IAD that they had either heard about or personally observed McCormick making sexually inappropriate remarks or engaging in sexually inappropriate behavior, although they also denied being personally offended by what they saw.[32]

---

[30] Exhibit 2 at 3-4.

[31] *Id.* at 3.

[32] Exhibit 1, Attachment J (Statements of R. Kelley [COH/Gregg000787-789]; K. Neal [COH/Gregg000817]; K. Himes [COH/Gregg000835]; J. Wilson [COH/Gregg000872].

Contrary to the City's bald-faced assertion, Gregg can also offer the jury evidence that Sgt. Perales in particular but also Sgt. White and Sgt. Roberson, were aware of McCormick's sexually-inappropriate conduct and remarks.[33] As he will testify, Sgt. Perales personally witnessed some of McCormick's sexually-inappropriate behavior toward Gregg, and even deliberately averted her eyes–holding, for example, papers or a file up to the side of her face as though to block her vision and remarking "I didn't see that," when clearly she had.[34] And Gregg will offer other evidence of Perales' knowledge, including a conversation with her in which she told him that she knew about McCormick's misconduct, and asked him for more details, which he provided.[35] He will also offer evidence that Officer Kelley was present during one conversation with Perales about McCormick's sexually-inappropriate behavior, a conversation that Officer Kelley also related to IAD.[36] While a jury may ultimately decide to not believe Gregg's testimony, the City's failure to even acknowledge the existence of this evidence violates one of the most basic rules for Rule 56 proceedings–that all evidence be assessed in a light most favorable to the non-movant.

Gregg will also show the jury evidence that, in addition to the legal requirement that supervisors who are aware o

---

[33] Exhibit 2 at 5.

[34] Exhibit 2 at 4.

[35] *Id*. at 5-6; *see also* Exhibit 2, Attachment B at 1-2. Gregg also informed Perales that Officer Sanchez was behaving similarly (although not directing so much of her misconduct towards her personally).

[36] Exhibit 1, Attachment G (excerpts from IAD file), Statement of R. Kelley, October 21, 2016. [COH/Gregg000787-789].

11

of sexual harassment must take prompt remedial action to stop it, the City and HPD also had policies and directives requiring that supervisors (1) take "immediate and appropriate action to stop and/or prevent further misconduct;" and (2) report the prohibited conduct to other HPD officials within 24 hours, if not sooner.[37] Not a one of Gregg's supervisors, however, fulfilled either their legal responsibilities or those imposed upon them by the City. They did not stop McCormick from engaging in the sexually-inappropriate misconduct toward Gregg, they did not prevent future misconduct by McCormick, and they did not report the sexual harassment to appropriate HPD authorities.[38]

With the most knowledge of the three, Perales' failure to act is most egregious. Perales did little but give lip service to the Department's policies. At best, she sent two emails to the investigators telling them, generally speaking, that HPD has a policy that prohibits sexual harassment and she called them together a few times and verbally reminded them of that policy as well.[39] But, she took no action against McCormick. And HPD admits that its supervisors have an obligation to let their subordinates know that the work environment must be professional.[40] If, its 30(b)(6) witness added, one effort to communicate that requirement does not succeed, then the

---

[37] *See, e.g.* Exhibit 1, Attachment C (City of Houston Executive Order 1-50) at 4; Exhibit 1, Attachment C (General Order 300-11) at 7 (*Supervisor Reporting and Response*); Exhibit 2, Attachment I (HPD Circular re Sexual Harassment and Other Prohibited Conduct) at 3; *see also* Exhibit 4 (Deposition of City's 30(b)(6) witness) at internal pages 72-74, 89-90, 121-122.

[38] Exhibit 2 at 7.

[39] Exhibit 2 at 7; *see also* Exhibit 2, Attachment A & Attachment I.

[40] Exhibit 4 (Deposition of City's 30(b)(6) witness) at internal pages 121-122.

supervisor has to be more and more direct.[41] Merely sending out a memo reminding people that sexual harassment is prohibited is often not enough–a supervisor has a duty to be proactive in ensuring that the policy is followed on the ground, and by all–every day.[42] Despite all the well-written policies, despite the number of times HPD tells its personnel that sexual harassment is prohibited, and despite the sergeants' knowledge of misconduct (especially that of Sgt. Perales), the City failed Michael Gregg. And, not surprisingly, McCormick did not stop.[43]

### C. Gregg's Formal Complaint and the Belated Removal of McCormick

What later became the "final straw" in McCormick sexual harassment of Gregg occurred on September 27, 2016, in a mandatory training session. At some point, one investigator took a picture of Officer Kelley, who was sitting next to Gregg but had his eyes closed, and texted that photo to others in attendance. When she received that text, McCormick zoomed in on the image of Gregg's crotch that was in the photo, held up her phone for others to see, called out to Gregg while pointing to his crotch and making "ooh" and "ah" sounds.[44] Gregg observed that several officers sitting nearby heard and saw McCormick and commented on her behavior.[45]

Several days later, the administrative sergeant, Sgt. Shaundra White, called Gregg into her office to put his initials on a box within his recent performance review–a box that, ironically,

---

[41] *Id.*

[42] Exhibit 4 (Deposition of City's 30(b)(6) witness) at internal pages 72-74, 89-91, 121-122.

[43] Exhibit 2 at 7; *see also* Exhibit 2, Attachment B, at 2.

[44] Exhibit 2 at 8; *see also* Exhibit 2, Attachment B (EEOC Charge) at 2.

[45] *Id.*

was a representation that he was familiar with HPD's prohibition against sexual harassment.[46]

Still stinging from McCormick's humiliating reference to his crotch the week before, Gregg told

Sgt. White that she needed to make McCormick read up on that policy and related the incident

that had just occurred at the training session.[47] Sgt. White ordered him to report to HPD's office

of Alternative Dispute Resolution and file a complaint against McCormick, and advised him to

limit the scope of his complaint to the most recent incident.[48]

When Gregg did as directed, Sgt. Lori White in Alternative Dispute Resolution Unit told

him that she would not be investigating the matter, that instead he needed to present his

complaint to Internal Affairs Division ("IAD") so it would investigate it.[49] An IAD investigation

is definitely not what Gregg wanted–he knew it meant that IAD would reveal his complaint to

others in his unit, that his colleagues would be given 48-hour notices and required to submit

written statements. And being involved in an IAD investigation is a process that no HPD officer

appreciates.[50]

**D. HPD's "Investigation" by IAD–An Intimidating, But Wholly Inadequate, Response**

While HPD is quick to brag that it promptly investigated Gregg's complaint, and that

McCormick was disciplined with a suspension, it fails to reveal the whole story. Gregg, however,

---

[46] Exhibit 2 at 8-9.

[47] *Id*.

[48] *Id*.

[49] Exhibit 2 at 10.

[50] Exhibit. 2 at 9-10; *see also* Dkt. 29-1 (Deposition of Michael Gregg) at internal page 60.

14

will offer evidence that IAD's investigation was anything but thorough. One thing it did accomplish though: it made Gregg a pariah in the eyes of his colleagues. Within days of when Gregg filed his complaint, IAD began sending copies of his complaint to his co-workers.[51]

The IAD investigation, however, was all conducted on paper. Gregg's co-workers were provided a copy of Gregg's complaint and were then required to answer specific questions in writing. There was very little follow-up, and Gregg was not provided an opportunity to know what his co-workers had said, to respond to inaccuracies in their statements, to rebut their allegations, to provide evidence disproving their claims of ignorance. McCormick, on the other hand, was provided copies of each statement presented by Gregg, and each of those presented by the other CSAU investigators.[52] Gregg was also denied the courtesy of any notice from the investigator about the conclusions or recommended outcome.[53]

In late December, the IAD lieutenant issued his report and recommended that the charges of sexual harassment against McCormick be sustained.[54] Some weeks later, the matter was reviewed by HPD's Administrative Disciplinary Committee, a committee composed of individuals from all ranks as well as members of the community, reviewed and discussed the

---

[51] Exhibit 2 at 10-11; see also Exhibit 1, Attachment J (examples of IAD notices to colleagues dated October 6, 2016).

[52] Exhibit 1, Attachment J (48-hour notice to McCormick) [COH/Gregg000924-000929].

[53] Exhibit 2 at 11.

[54] Exhibit 1, Attachment J (Lt. Garner, IAD, to Police Chief Acevado, December 20, 2016) [COH/Gregg000638-645, especially 000644].

results from the IAD investigation and the recommendation of the IAD lieutenant.[55] After conducting that review, the members of the ADC unanimously agreed that McCormick had engaged in sexual harassment and had also violated HPD's workplace conduct policy. It also determined that McCormick's misconduct was such that the appropriate disciplinary category was Category 5, which provides for the most severe sanctions against an officer, up to and including termination.[56] The Chief of Police, however, overruled both the IAD lieutenant's recommendation and the ADC's considered and collective judgment and decided instead that McCormick's only misconduct was that she had merely "failed to exercise sound judgment," and determined that a slap on the wrist (a 7-day suspension of which she had to serve only 5) was the extent of the adverse consequences McCormick would suffer.[57]

### E. Hostility from Co-Workers After the Complaint

And, as his co-workers were ordered to give statements during the IAD investigation, they began shunning Gregg. Documents related to case files, for example, would "disappear" from his desk and the printer; some days when he came to the office he discovered that case files on his desk had been moved around and rummaged through.[58] He was considered to be a department "snitch" and most officers in the unit no longer wanted to work with him. Most of the members of the squad started avoiding Gregg in even casual conversations in the office and he

---

[55] *See* Exhibit 1, Attachment J [COH/Gregg000595-000598]; *see also* Exhibit 4 (Deposition of HPD's 30(b)(6) Witness) at internal pages 63-65.

[56] Exhibit 1, Attachment J [COH/Gregg000631 & 000619-620]; *see also* Exhibit 2 at 11-12; Exhibit 4 at internal pages 63-65.

[57] *See* Exhibit 1, Attachment J [COH/Gregg000595-000598].

[58] Exhibit 2 at 12-14.

16

was no longer welcome to join the other members of the Unit when they socialized or shared

lunch breaks.[59] One officer called him a "troublemaker" to his face one day.[60] But the retaliation

extended to case work as well. While it had long been standard practice, for reasons of officer

safety, that a second investigator accompanied the one who needed to interview a suspect in the

individual's home, Gregg's colleagues suddenly became unavailable, or "too busy" to accompany

him after IAD began its investigation of the unit. This was a matter of officer safety because of

the risk investigators faced when interviewing suspects in child abuse cases in their homes.[61]

    And Gregg did not keep these acts of retaliation to himself. He spoke at length with Sgt.

Roberson (now Lt. Roberson), about the ostracism, cold-shouldering, and hostility he was

experiencing from the other investigators, and about their refusal to accompany him on home

visits when he was scheduled to interview a suspect in a child sexual abuse case. Roberson

acknowledged that he was aware of the problem, and told Gregg that one of the male

investigators had even referred to Gregg as a "bitch," saying that Gregg was "less than a man."[62]

    While the City of Houston argues in its motion that the refusals by Gregg's co-workers to

accompany him on suspect interviews was an insignificant matter. That assertion is not, however,

consistent with the written record. On April 24, 2017, Capt. Angelo very pointedly reminded

investigators of their duty, as a matter of officer safety, to accompany one another on suspect

interviews, and admonished them to not allow their interpersonal disagreements to get in the way

---

[59] *Id.*

[60] Exhibit 2 at 15.

[61] Exhibit 2 at 12-15.

[62] Exhibit 2 at 13-14.

17

of carrying out that responsibility. His email did not just appear from thin air; Angelo specifically

states that "recent issues" had led him to issue this directive:

> Please share with your respective sergeants and officers that whenever an
> investigator requests a second officer to assist with an interview/interrogation of a
> suspect, they are expected to assist the primary investigator . . .
>
> [It] is not acceptable for someone to request assistance from their fellow officer
> and they do not receive it. The overarching theme is the safety of our officers and
> not to put our personal differences ahead of our mission. The work we do in SVD
> is too important to allow whatever disagreements we may have with each other to
> take over and dictate who we will or will not help, and I cannot nor will not
> tolerate this behavior in SVD. The overwhelming majority of our officers are
> doing what they are supposed to, however, due to recent issues it has become
> necessary for me to put this directive out.[63]

It was, unfortunately, too little, too late.

## F. The Impact on Gregg and His Case Load

Eventually, the hostility that Gregg's co-workers were displaying toward him out of

resentment for his formal complaint led him to seek the advice and counsel of an in-house

psychologist, Dr. Meagan Houston, HPD Psychological Services Division.[64] As Dr. Houston

explained in a memo to Gregg's administrative sergeant on May 31, 2017:

> In the last several months, [Gregg] has continued to experience repeated exposure
> ta chronic and pervasive stressors in his current work environment of which he
> has no control. As a result, Officer Gregg has begun to exhibit symptoms related
> to critical incident stress of which may have a significant impact on his
> occupational functioning. Although Officer Gregg is capable and competent to
> conduct his assigned work duties, his current affective and cognitive resources
> may be temporarily compromised, thereby having the potential to negatively
> impact his work productivity. As a result of the above mentioned, he is continuing
> to adjust to these events and it is recommended that he be placed on a light duty

---

[63] Exhibit 2, Attachment D, E-mail from Thurston Roberson to CSAU members dated
April 25, 2017, re: Interviewing Suspects/Officer Safety. [Gregg000029].

[64] Exhibit 2 at 15-16.

status for approximately forty-five (45) days from the date of this letter or until he is ready to return to normal duty.[65]

**G. The Involuntary Transfer to a Much Less Desirable Position, and Its Impact**

The City conveniently glosses over how it came about that Gregg was transferred out of the prestigious position he had long held as an investigator/detective in the CSAU and assigned to a much less than desirable position in Juvenile Intake. It argues, in fact, that there is no evidence of any causal connection between Gregg's sexual harassment complaint and this involuntary transfer to Juvenile Intake. That may be one of the boldest misstatements of the record the City presents in its motion. As Gregg's evidence will show, the question of whether it might be best to transfer to another unit came up because he was experiencing so much retaliation from his colleagues as a result of his sexual harassment complaint.

On June 30, 2017, while Gregg's EEOC Charge was pending, the parties and their counsel met to discuss the matter. The undersigned represented Gregg at the meeting and the City was represented by two attorneys–Ann Speigel, Deputy Director, Chief's Command/Legal Services, and Camela Sandmann, Assistant City Attorney.[66] Among the issues the parties discussed were (1) the retaliatory conduct by and hostile attitude from his coworkers, including their refusal to assist him even when officer safety was in question, which had begun after he filed his sexual harassment complaint and continued to that day; and (2) the question of whether Gregg could/should be transferred to a comparable position in order to leave his co-workers' resentment and hostility behind and reestablish his bona fides with supervisors and co-workers

---

[65] Exhibit 2, Attachment Q, Memo May 31, 2017, from Dr. Meagan Houston, HPD Psychological Services Division, to Sgt. Shandra White re: Michael Gregg [COH/Gregg000247].

[66] *See* Exhibit 2 at 17-18; exhibit 3 at 1-2.

through the quality of his work and his character–to salvage his career, in other words.[67] The

discussion then centered on trying to find a unit to which Gregg would be willing to transfer. He

wanted an assignment where he would be similarly challenged both intellectually and

professionally, and he wanted to get away from the colleagues who so fervently resented his

sexual harassment complaint. He, of course, did not want to see his income drop nor would a

shift change be acceptable. Because Gregg was not familiar with all the units that could provide

him a comparable position, the City agreed to provide information and counsel agreed to confer

thereafter.[68] The June 30th conversation triggered a number of emails in the following weeks,

emails between counsel for the parties and among HPD supervisors and their counsel.

Gregg can present evidence showing that Capt. Angelo affirmatively wanted Gregg out of

the CSAU. On July 17th, he wrote to Ann Siegel with the Chief's Legal Division, asking for her

assistance in getting Gregg transferred and what he needed to do next to achieve that goal.[69]

While the City argues that Angelo's motivation was unrelated to the sexual harassment

complaint and investigation, the evidence is to the contrary. Angelo instead relied on the fact that

Gregg had been on light duty, and he knew why–because he had seen Dr. Houston's letter, who

attributed the need for that accommodation to the retaliation Gregg was experiencing because of

his sexual harassment complaint. And, after whining about the disparity in the investigators' case

---

[67] Exhibit 3 at 1-2; exhibit 2 at 17-18.

[68] Exhibit 3 at 1-2; Exhibit 3, Attachment A.

[69] Exhibit 1, Attachment E (email from Capt. David Angelo to Ann Spiegel re: Michael Gregg Light Duty Request Letter)  [COH/Gregg000075].

load, Angelo announced that Gregg "can't keep working at half case load in perpetuity."[70] Of course, Angelo knew that this was not Gregg's desire[71] and that Gregg was, in fact, ready to return to a full case load.[72] And he knew that it was HPD, not Gregg, who made the decision to take half of Gregg's cases away and that it was HPD, not Gregg, who chose to not assign Gregg new cases as he closed others during that 45 days. And, with the exercise of just a tiny bit of arithmetic, Angelo would have seen that the 45-day period ended on July 15, 2017–two days before sought Siegel's help to get Gregg transferred out of CSAU.

Gregg will offer evidence that, on August 4th, he personally reassured Angelo that he was ready to return to a full case load.[73] But, instead of addressing how and when that would/could occur, Angelo changed the subject and asked Gregg if he was ready to transfer out of CSAU. Thinking (wrongly, in retrospect) that he would be transferred to a mutually-acceptable, comparable position within HPD as had been discussed with the City and its counsel on June 30th, Gregg said "yes." And, when Angelo asked if Gregg had identified the units to which he would be willing to transfer, Gregg identified three: Juvenile Crimes investigator, Crime

---

[70] Exhibit 1, Attachment F (emails exchanged between Lt. Colburn and Capt. Angelo re: Michael Gregg, July 25, 2017) [COH/Gregg000073].

[71] Exhibit 2 at 18.

[72] Exhibit 1, Attachment D (emails exchanged between Lt. Colburn and Gregg on July 20, 2017) [COH/Gregg000102]; *see also* Exhibit 1, Attachment F (July 25, 2017, email from Lt. John Colburn to Capt. David Angelo re: Officer Gregg)  [COH/Gregg000073].

[73] Exhibit 2 at 18.

21

Stoppers, and Vice.[74] Gregg's counsel also communicated those three choices to Spiegel, counsel in the Chief's office, the following Monday.[75]

Unfortunately, the parties' cooperation went downhill from there. While Siegel said the next week that HPD was willing to assist Gregg in finding an assignment "in a unit for which he is both interested and qualified,"[76] she added that HPD expected Gregg to dismiss his sexual harassment claim against the City and release it from liability in exchange for that cooperation.[77] While Gregg was interested in achieving closure, a transfer to get away from hostile colleagues was itself insufficient consideration for him to forego his legal rights, and Gregg's counsel so informed the City.[78] Gregg's concern that his supervisors held him in disrespect after the sexual harassment complaint, after the retaliatory behavior of which he complained, and after his refusal to dismiss his sexual harassment complaint was confirmed one evening when he was working at the George R. Brown Convention Center assisting victims of Hurricane Harvey.[79] In a private conversation with Sgt. Lewis, who was newly assigned to CSAU, Sgt. Lewis advised him that his supervisors (specifically Capt. Angelo, Lt. Colburn, and Sgt. Alvarez) were upset with him for having followed through on the sexual harassment complaint and that they openly spoke disparagingly about Gregg. So open was their antagonism toward Gregg, Sgt. Lewis said, that

---

[74] Exhibit 2 at 18.

[75] Exhibit 3 at 1-2; *see also* Exhibit 3, Attachment A.

[76] Exhibit 3 at 1-2; *see also* Exhibit 3, Attachment B.

[77] *Id*.

[78] Exhibit 3, Attachment B at 1.

[79] Exhibit 2 at 18-19.

they no longer spoke in code around him, and freely used Gregg's name when making those comments. Sgt. Lewis told Gregg that he should, for the sake of his career, leave the CSAU because those supervisors were about to make life difficult for him, that he had been "black balled," and that he could not "beat them" or change their impression. For the sake of his career, Sgt. Lewis said that Gregg should leave CSAU and start over somewhere different, that he should find a new division to call home.[80]

Later that same evening, Capt. Angelo and Lt. Colburn pulled Gregg aside and gave him papers showing that he was being involuntarily transferred to the Juvenile Division.[81] Gregg was given no details, and no advance warning. He was told to report to the Juvenile Division that next Monday morning, September 11, 2017. While he asked, neither Angelo nor Colburn could tell Gregg the unit to which he was being assigned; instead he was told to report to the administrative sergeant for the entire division, Sgt. Teel.[82] The lack of advance notice is not typical–HPD policies provide that an officer being transferred is allowed 10 days to clear his or her desk and organize his assignments to facilitate an efficient hand-off to another, but, for some reason that was never explained, Gregg was denied that professional courtesy.[83]

---

[80] Exhibit 2 at 18-19; *see also* Exhibit 2, Attachment P (Gregg Statement to IAD, January 10, 2018).

[81] Exhibit 2 at 19-20; *see also* Exhibit 2, Attachment O (involuntary transfer paperwork); Exhibit 1, Attachment G (emails between Capt. Angelo and Ann Spiegel re: Gregg's involuntary transfer, September 8, 2017) [COH/Gregg000077-000078].

[82] Exhibit 2 at 18-19.

[83] Exhibit 2 at 21.

Gregg, of course, followed orders and reported to Sgt. Teel on the morning of Monday, September 11, 2017.[84] Gregg still thought that HPD was going to honor his request for a transfer to a Juvenile Crimes investigator position, but that was not to be. Sgt. Teel advised him that he was instead required to report to Juvenile Intake Unit.[85] When Gregg reported to that unit, the sergeant said he was not expected and Gregg was forced to spend hours doing nothing. And, he quickly learned that, generally speaking, there was very little work for him (or the other officers in the unit) to do.[86] Gregg also learned shortly after his arrival that he no longer had a Monday through Friday shift with weekends off; instead, he had to work the evening shift and his days off were during the week.[87]

Gregg will offer evidence that the Juvenile Intake unit is one of the least desirable assignments for HPD officers within the department. Officers, in fact, refer to it as "the graveyard" because it was where officers' careers go to die.[88] It is common knowledge that Juvenile Intake unit is not a highly sought after unit, that officers who graduate in the bottom of their class at the Academy are often assigned there, as are low performing officers and officers being "run off" by their previous units for subpar work. Gregg will offer evidence that one officer in Juvenile Intake had been arrested in his capacity as an officer, but kept his job in the unit, and that another officer had pulled her weapon on her boyfriend, but didn't lose her job. While there

---

[84] Exhibit 2 at 20.

[85] *Id.*

[86] *Id.* at 20-21.

[87] *Id.*

[88] Exhibit 2 at 20.

are some officers who voluntarily seek assignments to this unit, they are not motivated by the challenging and prestigious nature of the work; instead, this is, for some, the only avenue out from Patrol because they lack the knowledge base to be selected for other non-Patrol units in HPD. And, some officers who are enrolled in school desire this assignment because it is not demanding, allowing them a lot of time on duty to do their homework for school.[89]

In CSAU, Gregg had challenging work–he was an investigator charged with tracking down evidence in cases of child sexual abuse; it was stimulating and rewarding work. As Gregg's evidence will show, however, his position in Juvenile Intake was at the entire opposite end of the spectrum. His job was to be available to process any juveniles who were arrested during his shift, a process that required only about 20-30 minutes per juvenile, and, as his evidence shows, the work was shared among three officers and one sergeant on the evening shift even though there were often only three to four juveniles arrested during an entire shift.[90] As a result, most officers there spent a great deal of time watching shows on their iPads, or paying their personal bills, or doing homework assignments for classes.[91] The work was far from intellectually stimulating and not at all professionally rewarding. Gregg lost the incentive pay he had been receiving as an investigator and, because of having to work the evening shift, he no longer had the ability to work extra jobs as he had while in CSAU, which cost him several thousands of dollars a year.[92]

---

[89] *Id*. at 20-21.

[90] *Id*.

[91] *Id*.

[92] *Id.* at 24.

Gregg can also present evidence that, even though his supervisors had succeeded in transferring him away, they continued to engage in actions that a reasonable jury could view as an extension of their retaliatory hostility. While HPD had inexplicably denied Gregg the typical 10-day notice that would have facilitated his efficient handing off of cases to other investigators, he was gratuitously blamed for problems Sgt. Alvarez had with his files. On the second day of his new assignment, she sent him an email full of criticisms about the state of some of his files.[93] She falsely asserted that he had lost witness statements and castigated him for there having been a delay between the dates on which the district attorney had accepted his cases and him walking those files downtown. Gregg responded with as much detail as he could given that he no longer had access to his files, and explained how some of Alvarez's conclusions were in error.[94] And, when he was allowed time to return to CSAU to look at his files, he discovered that, through no fault of his own, witness statements had been removed from some files; but, fortunately, he was able to retrieve the originals from the voice recorder he had returned to the unit.[95]

Gregg can offer also evidence that would support a reasonable inference that Capt. Angelo's continued ill-motive toward him led him to denigrate Gregg's performance, falsely, in the eyes of Gregg's new supervisors. Specifically, and also on Gregg's second day of working in Juvenile Intake, Angelo sent an email to Gregg's new captain saying that Gregg had "sat on several child sexual assault cases where charges were accepted but he never walked the warrant

---

[93] Exhibit 2 at 21; *see also* Exhibit 2, Attachment K (email exchanges between Sgt. Alvarez and Michael Gregg September 12, 2017 re: Open Cases) [COH/Gregg000088-000090].

[94] *Id*. at 21-22.

[95] Exhibit 2 at 21-22.

26

through the DA's office."[96] Gregg can offer evidence that this disparaging comment was wholly

inappropriate because Angelo himself knew that the cited delays were far from unusual, that it

was common for all CSAU investigators to wait, sometimes weeks, between having charges

accepting and filing the case. As Gregg's evidence shows, only 90 minutes after Angelo's

gratuitous and derogatory comment about Gregg, Angelo acknowledged that it was common

practice for the investigators to wait weeks before filing charges.[97]

### H. The Derogatory and False Review

And that was not the end of it. Gregg will offer evidence that his former supervisors tried

again to poison his reputation among his new supervisors by sending them a copy of a highly-

derogatory and false performance review the following month. As Gregg's evidence will show,

his new lieutenant came to him on October 20, 2017, and gave him a document he said he had

found on a sergeant's desk.[98] It was Gregg's six-month performance review for the period ended

August 31, 2017, prepared by Sgt. Alvarez and signed by Lt. Colburn.[99] It was the lowest Gregg

had received in his career and contained a number of false statements. First, it falsely stated that

Gregg was one of the lowest producers in the Unit. That was not true–Gregg had about 28-30

cases in the Summer of 2017; his case load had been temporarily reduced as a reasonable

---

[96] Exhibit 1, Attachment H (emails between Capt. Angelo and Capt. Lentini (Juvenile Division) re: Gregg September 12, 2017) [COH/Gregg000079-000080].

[97] Exhibit 2, Attachment M (email from Lt. Colburn to CSAU investigators and sergeants September 12, 2017 re: charges) [Gregg000041].

[98] Exhibit 2 at 23.

[99] Exhibit 2 at 23; *see also* Exhibit 2, Attachment R.

27

accommodation, but Gregg had no control over what cases Alvarez assigned him.[100] And, while the review states that Gregg had only two cases, Alvarez's email of September 12, 2017, identifies eight cases for Gregg in the database and another 15 case files still on his desk.[101] She also falsely asserted that Gregg had only one arrest and one charge in the entire six months, which is belied by her email reporting that the district attorney had issued charges in three of Gregg's files in mid-August alone.[102]

Gregg has evidence he can show the jury that a negative performance review is not simply a piece of paper stuck in an officer's personnel file. Rather, it is a document that would be available to and reviewed by any supervisor who might be assessing his request for another investigator's position in the future.[103] A reasonable jury could certainly infer that Gregg would have little chance of being selected for such a prestigious position with such negative comments from the sergeant who supervised him when he served as an investigator.

## II. Argument and Authorities

The City's legal arguments are fraught with errors and misstatements of the law. If the jury were to accept the evidence that Gregg has to offer in support of his claims, the record would be more than adequate to substantiate a plaintiff's verdict on both claims.

---

[100] *Id.*

[101] Exhibit 2 at 23-24; *see also* Exhibit 2, Attachment R and *compare with* Exhibit 2, Attachment K.

[102] *Id.*

[103]  Exhibit 2 at 25.

28

## A. Genuine Issues of Material Fact Require a Jury's
## Assessment of the Evidence of Gregg's Retaliation

One problem with the City's motion is that it wrongly attempts to Balkanize the evidence Gregg has to offer in support of his retaliation claim. While all the evidence has to be assessed in together, and in context, the City tries to take each incident apart, thereby allowing it to minimize the significance of the events. As Gregg is prepared to show the jury, however, the retaliation he suffered was not limited to one discrete act or decision. It began with his co-workers ostracizing him, humiliating him, and refusing to accompany him on interviews of suspects, thus putting his safety in jeopardy. The evidence also shows that the desire to punish Gregg for making a formal complaint of sexual harassment was not limited to his colleagues, that, in fact, his supervisors–Capt. Angelo, Lt. Colburn, and Sgt. Alvarez–shared that antagonism toward him. And it shows that, but for Gregg's refusal to dismiss his sexual harassment claim entirely, the City would have allowed him to transfer to a comparable, and prestigious unit–instead, HPD assigned him to one of the least desirable units in the department.

## B. The Retaliation Claim Requires a Jury Trial

Retaliation claims under Title VII are analyzed under the *McDonnell Douglas* burden-shifting framework. First, the plaintiff is required to show a prima facie case of retaliation, which he may do by establishing that: (1) he engaged in protected activity; (2) the employer took a materially adverse action against him; and (3) a causal link exists between his protected activity and the adverse action.[104] Once that burden is met, the burden shifts to the

---

[104] *Melvin v. Barr Roofing Co.*, 806 F. App'x 301, 306 (5th Cir. 2020) (*citing Raggs v. Miss. Power & Light Co.*, 278 F.3d 463, 471 (5th Cir. 2002); *Wheat v. Fla. Par. Juvenile Justice Comm'n,* 811 F.3d 702, 705 (5th Cir. 2016) (*citing, e.g., Davis v. Fort Bend Cnty.*, 765 F.3d 480, 489–90 (5th Cir.2014), *cert. denied*, 135 S.Ct. 2804 (2015)).

29

defendant to state a legitimate, non-retaliatory reason for the adverse action.[105] Should the defendant make that showing, which the City cannot in this case, the plaintiff may still prevail by showing that the reason articulated by the defendant is pretextual.[106]

### 1. Gregg's Protected Activity

There is no dispute that Gregg's filing of a formal complaint of sexual harassment, and his subsequent filing of an EEOC charge of discrimination, constitute protected activity as that term is used in the context of a Title VII retaliation claim.[107]

### 2. The City Took Material Adverse Actions Against Gregg

The City of Houston improperly argues that, because Gregg did not suffer an "adverse employment action," he cannot prevail on his claim of retaliation as a matter of law. That is a misstatement of the law. As the Supreme Court explained over a decade ago, there is a difference between the evidence necessary to show discrimination and that required of an individual asserting a retaliation claim. The former requires proof of an "adverse employment action," a formal decision by the employer to change an employee's status–to, for example, fire the person, demote him, or deny her a promotion. These are described as "actions that affect employment or alter the conditions of the workplace."[108] But, the scope of conduct prohibited by Title VII's anti-retaliation provision is much broader because "an employer can effectively retaliate against an

---

[105] *Wheat*, 811 F.3d at 710.

[106] *Davis*, 765 F.3d at 489.

[107] 42 U.S.C. § 2000e–3(a).

[108] *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006).

employee by taking actions not directly related to his employment or by causing him harm outside the workplace."[109]

In a recent decision with facts similar to the evidence that Gregg has to offer a jury in this case, the Fifth Circuit announced that it would have "no trouble" finding that the evidence was sufficient to show an actionable claim of retaliation when (1) the police officer had been transferred from a daytime shift during the week to a night shift that required him to work weekends; (2) the unit to which he was transferred was a widely-acknowledged inferior position; and (3) the officer lost income from an extra job he could no longer work due to that shift change.[110] And, as the Fifth Circuit has acknowledged, even a lateral reassignment to a position with equal pay could amount to a materially adverse action in some circumstances.[111] As the Court observed, a retaliatory shift change that places a substantial burden on the plaintiff, such as one that significant interfers with outside responsibilities or drastically and causes him to work what are objectively less desirable hours, is sufficient to dissuade an employee from reporting discrimination.[112]

_____

[109] *Id.* at 63-64 (*citing, e.g., Rochon v. Gonzales*, 438 F.3d 1211, 1213 (D.C. Cir. 2006) (Federal Bureau of Investigation retaliation against employee "took the form of the FBI's refusal, contrary to policy, to investigate death threats a federal prisoner made against [the agent] and his wife"); *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 984, 986 (10th Cir. 1996) (finding actionable retaliation where employer filed false criminal charges against former employee who complained about discrimination)).

[110] *Johnson v. Halstead*, 916 F.3d 410, 421 (5th Cir. 2019).

[111] *Johnson*, 916 F.3d at 420 (*citing Aryain v. Wal-Mart Stores Texas LP*, 534 F.3d 473, 485 (5th Cir. 2008). The Johnson Court also cited with approval

[112] *Johnson*, 916 F.3d at 420-21 (*citing Ginger v. District of Columbia*, 527 F.3d 1340, 1344 (D.C. Cir. 2008) (finding potential Title VII retaliation when police officers were switched from a permanent shift to a rotating shift because the change "severely affected [the officers']

Gregg can offer a jury in this case that same quality and quantity of evidence of retaliatory conduct on HPD's part–and more. In this case, however, Gregg can offer evidence that he indeed suffered not merely a materially an adverse employment action. His evidence shows that a position in Juvenile Intake is significantly less prestigious than one as an investigator in an elite unit such as the CSAU. His involuntary transfer to that position could thus reasonably be viewed as a constructive demotion just in terms of the job itself. But, he has more evidence than that–he went from a day shift with weekends off to an evening shift without weekends off, which could be objectively viewed as a most undesirable change in his schedule. And, the involuntary transfer cost his thousands of dollars a year–he lost the incentive pay he had received when working as an investigator and he lost significantly more than that when his new schedule prevented him from working a number of extra jobs. Thus, under well-settled law, a reasonable jury could easily conclude that the adverse consequences Gregg suffered after making a sexual harassment complaint would indeed be sufficient to dissuade other police officers from making complaints of discrimination.[113]

A reasonable jury could also conclude that the negative, and false, performance review that Gregg was given for the six-month period ending August 31, 2017, was such that it would dissuade a reasonable police officer from filing a formal complaint of sexual harassment. The

---

sleep schedules and made it more difficult for them to work overtime and part-time day jobs"); *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) (finding lateral transfer requiring normal 9-to-5 schedule could be materially adverse when prior flex-time hours were necessary for plaintiff to care for her son with Down syndrome)).

[113] *See, e.g, Johnson v. Halstead*, 916 F.3d at 421; *Webb v. Round Rock Indep. Sch. Dist.*, 595 F. App'x 301, 303 (5th Cir. 2014) (a lateral transfer can amount to an adverse employment action without affecting the usual terms of employment).

document, which would be reviewed by supervisory personnel for any unit to which Gregg might

apply for a transfer, would definitely stand in the way of a positive reception. After all, it states

(wrongly, and falsely) that Gregg was the lowest performer in the unit, that he put the department

at risk by failing to timely file warrants, and he mishandled witness statements.[114] While none of

those statements are true, the likelihood that Gregg would be allowed to rebut them as a

prospective supervisor reviewed applicants' performance reviews for a desired, indeed

prestigious, position would be highly unlikely.

### 3. The Causal Link Between Gregg's Protected Activity and the Materially Adverse Actions

Contrary to the City's argument, Gregg can offer evidence that ties the retaliation he

suffered to his complaint of sexual harassment, his complaint of retaliation, and his refusal to

dismiss his sexual harassment complaint. Both Capt. Angelo and Sgt. Alvarez demonstrated that

antagonism themselves with their emails and the negative, and false, performance review.

Further, Sgt. Lewis told Gregg directly that his supervisors were openly disparaging him, that

they had black-balled him, and that Gregg should find a home in another division for the sake of

his career.

A reasonable jury could conclude that the cumulative effects of the retaliatory acts that

Gregg suffered after taking his sexual harassment complaint to IAD was "materially adverse,"

that the punishment he endured was such that it would dissuade a reasonable officer from making

a sexual harassment complaint. Gregg's colleagues made his workplace so miserable that it

adversely affected his ability to perform, his ability to concentrate, and his ability to complete his

work efficiently. And their retaliatory animus toward Gregg put his safety in danger on more than

---

[114] Exhibit 2 at 23-25.

one occasion. And, shortly after refusing to dismiss his sexual harassment claim, Gregg was

transferred to one of the least prestigious units in HPD–a transfer that cost him thousands of

dollars.

Ultimately, whether an employee's protected conduct was a substantial or motivating

factor in an employer's decision to take action against the employee is a question of fact,

rendering summary disposition inappropriate.[115]

A jury could quite reasonably infer from all this evidence – both direct and circumstantial

– that the City's self-serving denial is simply not believable. It is well-settled law in this Circuit

that circumstantial evidence of knowledge is enough to preclude summary judgment.[116] As one

court recently explained:

> Retaliation cases must often be proven with "the cumulative weight of
> circumstantial evidence, since an employer who discriminates against its
> employee is unlikely to leave a well-marked trail, such as making a notation to
> that effect in the employee's personnel file."[117]

---

[115] *Click v. Copeland*, 970 F.2d 106, 113 (5th Cir. 1992) (*citing Brawner v. City of Richardson, Tex.*, 855 F.2d 187, 193 (5th Cir.1988) (summary judgment inappropriate because defendant's motive is a material issue of fact)).

[116] *Bosque v. Starr Cty.,* 630 Fed. App'x 300, 305 (5th Cir. 2015); *Mooney v. Lafayette County School Dist.*, 528 Fed.App'x. 447, 456-57 (5th Cir. 2013) (causal connection may be established with evidence of a chronology of events from which retaliation may plausibly be inferred); *Brady v. Houston Indep. Sch. Dist.*, 113 F.3d 1419, 1424 (5th Cir. 1997); *Smith v. Chicago Bridge & Iron Co., N.V.*, 2017 WL 2619342 at *5 (S.D. Tex. June 16, 2017). *Cf. Gee v Principi*, 289 F.3d 342, 346-347 (5th Cir.2002) (direct evidence not required to enable fact finder to conclude that a decisionmaker was influenced by a person with a retaliatory motive). *See also Luckie v. Ameritech Corp.*, 389 F.3d 708, 715 (7th Cir. 2004) (all that is necessary to defeat summary judgment is for the plaintiff to have evidence that would support a reasonable inference that the decision-maker was aware of the plaintiff's protected activity).

[117] *Smith*, 2017 WL 2619342 at * 5.

34

### 4. The Temporal Proximity of the Retaliatory Conduct

Key evidence of the causal connection between Gregg's protected conduct and the retaliatory acts he suffered is the temporal proximity between the dates of his protected conduct and when the various actions of retaliation occurred. Within days of presenting his sexual harassment complaint to IAD, Gregg's co-workers began retaliating against him. They, for example, ostracized him, refused to take a desk near his, told him that they didn't want to be seen with him, messed with the files on his desk when he was not in, and called him a "troublemaker." More egregiously, they refused to accompany him as a second officer when he was required to interview a suspect in a child abuse case at the person's home–which, HPD acknowledges, creates a risk to officer safety. And, within a month of Gregg's clear refusal to dismiss his sexual harassment claim just so it would cooperate with him and secure his transfer to a comparable position, but one that was not hostile, HPD transferred him to one of the least prestigious units in the department, caused him to lose a significant amount of money, and adversely affected his familial responsibilities. Temporal proximity is commonly accepted as sufficient evidence in Title VII retaliation cases.[118]

Finally, the implausibility of the City's arguments would allow a reasonable jury to reject them and find, instead, that Gregg suffered from actions that violated Title VII. It was, in fact,

---

[118] *See, e.g., Johnson v. Halstead*, 916 F.3d at 421 (a three-month lapse between the plaintiff's complaint and his transfer supported his claim that the two events were related); *Bosque v. Starr County,* 630 Fed.App'x at 304-05; *Evans v. City of Houston*, 246 F.3d 344, 354 (5th Cir. 2001) (noting that a "time lapse of up to four months" may be sufficient to establish a causal connection) (*quoting Weeks v. NationsBank, N.A.*, 2000 WL 341257, at *3 (N.D. Tex. 2000)); *Vojvodich v. Lopez*, 48 F.3d 879, 886 (5th Cir. 1995) (a three and one-half month lapse of time .

almost 50 years ago when the Supreme Court observed that, when an employer's stated reason for engaging in the conduct that the plaintiff is challenging is just too trivial, even if true, to rationally justify that action, that alone is sufficient from which to infer the employer's unlawful intent.[119] A jury would be reasonable to make a similar inference if it decided that an employer's stated reason for the decision just does not seem to make sense;" disbelief of the stated reason is commonly accepted as showing that the reason offered was but a pretext for unlawful discrimination."[120] And the City does not, and cannot, offer any explanation for why Gregg was involuntarily transferred to one of the least prestigious units in HPD, why he had to give up a family-friendly schedule, or why it was necessary for him to lose several thousand dollars a year. Nor does, or can, the City justify how Sgt. Alvarez decided to include falsehoods in Gregg's performance review, or why she decided it was necessary to share that document with Gregg's new supervisors at Juvenile Intake.

### C. The City Is Liable for the Sexual Harassment That Gregg Endured

To prove a hostile work environment claim, a plaintiff must show that "(1) [he] belongs to a protected group; (2) [he] was subjected to unwelcome harassment; (3) the harassment complained of was based on [sex] race; (4) the harassment complained of affected a term,

---

[119] *Pickering v. Board of Education,* 391 U.S. 563, 579-580 & n.1 (1968); *see also Laxton v. Gap Inc.*, 333 F.3d 572, 581 (5th Cir. 2003) (allegations were "so trivial as to be unworthy of credence."); *Boehms v. Crowell*, 139 F.3d 452, 458 (5th Cir. 1998) (there was considerable evidence to suggest that the negative evaluation of the plaintiff was "overblown, if not disingenuous").

[120] *Young v. United Parcel Serv., Inc.,* 135 S. Ct. 1338, 1356 (2015).

36

condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action."[121]

Gregg's evidence is sufficient to show a prima facie case. Men, just like women, belong to a protected group.[122] And, Gregg will offer evidence to the jury that McCormick's behavior toward him was unwelcome; his evidence is that he avoided her, he averted his eyes, he tried to ignore her, and he complained about it to his supervisors. His evidence is also sufficient to show that the harassment to which he was subjected was because of his gender. Evidence that an individual of one gender engages in sexually inappropriate conduct and makes sexually inappropriate remarks to someone of the opposite gender does so because of the victim's sex.[123] This is especially appropriate where, as here, there is no evidence that McCormick directed the same volume of sexually inappropriate misconduct toward anyone else, much less a female officer, as frequently or for as prolonged a period of time as she did toward Gregg.

### 1. The Sexual Harassment Was Sufficiently Severe or Pervasive

And Gregg has substantial evidence that McCormick's misconduct affected a term, condition, or privilege of employment. In sexual harassment cases, this requirement is satisfied with evidence that the act of which the plaintiff complains was sufficiently severe or pervasive to

---

[121] *Melvin v. Barr Roofing Co.*, 806 F. App'x 301, 308 (5th Cir. 2020) *(citing Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)).

[122] *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78, 118 S. Ct. 998, 1001 (1998) ("Title VII's prohibition of discrimination 'because of ... sex' protects men as well as women") (citing *Newport News Shipbuilding & Dry Dock Co. v. EEOC*, 462 U.S. 669, 682, 103 S.Ct. 2622, 2630 (1983).

[123] *Oncale,* 523 U.S. at 80 (in male-female sexual harassment situations, it is reasonable to assume that, if the conduct involved explicit or implicit proposals of sexual activity, it occurred because of sex).

alter the conditions of the victim's employment and create an abusive working environment."[124] In 1993, the Court sought to describe this standard as "tak[ing] a middle path" between conduct that is "merely offensive" and that which causes a tangible psychological injury. The question of whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances.[125] There are four factors to be examined in assessing whether the conduct rises to the level of violating the law, with the first being the frequency of the conduct. Whether the conduct is humiliating is another factor to be considered, as is the question of whether it unreasonably interferes with an employee's work performance. As Gregg has testified, the sexually-inappropriate conduct and remarks that McCormick addressed to him occurred with great frequency–practically every day. And it went on for two years. This is more than sufficient to constitute actionable sexual harassment.[126] While the City seeks to discount the significance of McCormick's sexually inappropriate harassment of Gregg, the law is clear that it is inappropriate to disaggregate the individual acts of harassment. To do so, after all, "robs the incidents of their cumulative effect;" just as " '[a] play cannot be understood on the basis of some of its scenes but

---

[124] *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 64-65 (1986).

[125] *Harris v. Forklift Sys.,* 510 U.S. 17, 23 (1993).

[126] *See, e.g., Farpella-Crosby v. Horizon Health Care*, 97 F.3d 803, 805 (5th Cir.1996) (the plaintiff was frequently asked about her sexual life and sexual activity; comments of this nature occurred two or three times a week; the comments included attributing her large number of children to her proclivity to engage in sexual activity; joking to a group of people at the work facility that she did not know how to use condoms; and she was often asked where she had been the night before, whether she had taken men home, and whether they "got any.").

only on its entire performance, ... similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.'"[127]

And, in stark contrast with the arguments of its counsel, the City's own records show that the misconduct of which Gregg was complaining rose to the level of sexual harassment. If, after all, HPD had viewed his allegations as being about no more than When, for example, Gregg first presented his complaint to ADR, HPD concluded that he had alleged more than "mere offensive utterances or displays of discriminatory or sexually suggestive materials," which is why his complaint was classified as a Class I violation that had to be investigated by IAD.[128] And, after investigating the complaint, IAD recommended that Gregg's sexual harassment complaint be sustained, a recommendation with which HPD's own Administrative Disciplinary Committee concurred.

### 2. The City Was Negligent and Is Thus Liable

While the City argues that Gregg cannot prevail because he did not file a formal report of sexual harassment until the behavior had been ongoing for two years, HPD's witness admits that there is no such requirement.[129] HPD admits that an employee's failure to overtly object to sexual harassment is no evidence that it was welcome, nor is an employee's decision to not make a verbal protest when subjected to sexual harassment–the employee's decision can be quite

---

[127] *Donaldson v. CDB Inc.*, 335 F. App'x 494, 503 (5th Cir. 2009).

[128] Exhibit 1, Attachment A (General Order 300-11) at 1 ("Definitions" section). And, complaints that fall into the Class II category are usually investigated by an employee's immediate supervisor or another supervisor from the employee's division, not IAD. See Exhibit 1, Attachment B (General Order 200-03) at 1 ("Classes of Complaints"). *See also* Exhibit 2 at 9.

[129] Exhibit 4 (Deposition of 30(b)(6) Witness) at internal pages 86-91.

reasonable, in fact when there is a power differential, or when the misconduct is open and obvious and no one else was doing anything to stop it either.[130] Ultimately, even if the recipient of unwelcome sexual harassment says nothing, a supervisor still has a responsibility to step in and put an end to the behavior.

Lastly, Gregg can offer substantial evidence to the jury that the City knew or should have known of the harassment in question and failed to take prompt remedial action. Gregg himself provides evidence that his supervisors, and especially Sgt. Perales, knew about McCormick's misconduct; she saw some of the incidents with her own eyes,[131] and both Gregg and Officer Kelley spoke with her about McCormick's misconduct. Gregg also offers testimony that Sgt. White knew about the sexually inappropriate conduct and remarks that McCormick was directing toward Gregg as did, later, Sgt. Roberson. And the evidence is uncontroverted that none of these supervisors took action that would have brought that behavior to a halt, despite the fact that the City, and HPD, have both adopted policies, pieces of paper, that require supervisory personnel to both report acts of sexually inappropriate misconduct and take action to stop the misbehavior.[132]

---

[130] *Id.*

[131] The City disingenuously advises the Court that Gregg admitted that he did not report McCormick's misconduct to Perales. And yet Gregg testified in his deposition, which the City filed as an exhibit to its motion, that he did not have to report the misconduct to Perales because she was already personally aware of it. *See* Dkt. 29-1 (Deposition of Michael Gregg) at internal page 48.

[132] *See* Exhibit 1, Attachment C, Executive Order re: Workplace Discrimination and Harassment at 4, § 9.2 ("Any supervisor or manager who receives a complaint of workplace or sexual harassment or other prohibited conduct or who observes prohibited conduct in his or her department shall take prompt and appropriate action reasonably necessary to ensure compliance with this policy."); Exhibit 1, Attachment A, General Order 300-11, at internal page 7 ("Supervisors who witness, are advised of, or otherwise become aware of prohibited conduct are required to report the prohibited conduct and cannot agree to do otherwise.").

This evidence is more than sufficient to support a jury's conclusion that the City was negligent, and negligence, as the courts have long observed, "sets a minimum standard for Title VII liability."[133] This has long been the law in the Fifth Circuit, as the City well knows from previous jury verdicts.[134] And, despite the position that the City's counsel now urges, the evidence that its supervisory personnel knew of this sexual harassment has long been in HPD's possession: Gregg told the IAD that his supervisor knew of the harassment,[135] he included that detail in his EEOC Charge,[136] and he testified about it in his deposition.[137] But, Gregg's supervisors failed in their responsibilities. Perales' generic emails parroting the words of HPD's policy were, not surprisingly, woefully inadequate.

---

[133] *Burlington Industries v. Ellerth*, 524 U.S. 742 (1998); *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2289 (1998) (noting that the circuits have uniformly applied a negligence standard to Title VII cases involving harassment by co-workers). *See also Williamson v. City of Houston*, 148 F.3d 462, 464–65 (5th Cir. 1998) (either actual or constructive notice is sufficient for liability, and constructive notice can result from "showing the pervasiveness of the harassment" (*citing Jones v. Flagship Int'l*, 793 F.2d 714, 720 (5th Cir.1986); *Waltman v. International Paper*, 875 F.2d 468, 478 (5th Cir.1989)).

[134] *See, e.g.*, *Sharp v. City of Houston*, 164 F.3d 923, 929 (5th Cir. 1999) (evidence that supervisor knew or should have known of the sexual harassment to which the HPD officer was subjected was sufficient to uphold the jury verdict in the plaintiff's favor); *Williamson v. City of Houston*, 148 F.3d 462, 464 (5th Cir.1998) (same). *See also Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 404 (5th Cir. 1993) (An employer becomes liable for sexual harassment if it knew or should have known of the harassment and failed to take prompt remedial action."); *Jones v. Flagship Int'l*, 793 F.2d 714, 720 (5th Cir. 1986) (requiring proof that the employer knew or should have known of the harassment in question and failed to take prompt remedial action); *Waltman v. Int'l Paper Co.*, 875 F.2d 468, 477 (5th Cir. 1989) (same).

[135] *See* Exhibit 2, Attachment G at 2 (Gregg's Second Statement to IAD dated October 10, 2016).

[136] *See* Exhibit 2, Attachment B.

[137] *See* Dkt. 29-1 (Deposition of Michael Gregg) at internal page 48.

41

### 3. The Sexual Harassment Claim is Not Time-Barred

The City also tries to avoid liability by claiming that the events of which Gregg complains are time-barred–that they occurred more than 300 days before he filed his Charge of Discrimination. There is no merit to that argument, as the U.S. Supreme Court held 18 years ago in *Nat'l RR Passenger Corp. v. Morgan*.[138] Unlike decisions such as terminations or demotions, a hostile work environment claim is comprised of a series of separate acts that collectively constitute one "unlawful employment practice." Because the timely filing provision requires only that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened,

> It does not matter, for purposes of the statute, that some of the component acts of the hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.[139]

Gregg filed his initial charge of discrimination on March 31, 2017, and 300 days before that was June 4, 2016.[140] As Gregg stated in his Charge, the unlawful sexual harassment of which he complains began as early as August 2014 and continued through September 2016. And the conduct was similar throughout the entire period–McCormick engaged in "inappropriate and lewd sexual comments and innuendos, ... on a regular basis" and stopped by his desk "practically every day and made inappropriate and unwelcome comments.[141] These actions are sufficiently

---

[138] 536 U.S. 101, 118 (2002).

[139] *Id.* at 117.

[140] Exhibit 2, Attachment B.

[141] Exhibit 2, Attachment B at 1-2, §§ 2-6.

similar, occurred with great frequency, and involved the same perpetrator, all of which evidences

that his complaint is about one continuous act of harassment under the teachings of the *Morgan*

case.

## VII. Conclusion

The defendant's motion is without merit; neither the evidence nor the arguments it

presents are sufficient as a matter of law to support summary judgment. Whether they are

believable, or pretextual, is, in the words of the Fifth Circuit, "fodder for the jury."[142]

<div style="margin-left: 50%">

Respectfully submitted,

/s/ Margaret A. Harris

Margaret A. Harris*
State Bar No. 09081400
1007 Heights Boulevard
Houston, Texas  77008
713-526-5677
888- 370-5038 (fax)
margie@butlerharris.com

Counsel for the Plaintiff

</div>

## Certificate of Service

I hereby certify that on November 22, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the parties listed on the Court's ECF transmission list.

<div style="margin-left: 50%">

/s/ Margaret A. Harris

</div>

---

[142] *Haverda v. Hays Cty.*, 723 F.3d 586, 596 (5th Cir. 2013) (*citing Click*, 970 F.2d at 113–14 (finding that evidence of motivation for adverse employment action, along with plaintiff's evidence supporting a contrary inference, is "fodder for the jury").