United States District Court
Southern District of Texas

**ENTERED**

February 05, 2021

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

MICHAEL GREGG,                        §
                                      §
        Plaintiff,                    §
                                      §
                                      §
v.                                    §    CIVIL ACTION NO. H-18-4822
                                      §
THE CITY OF HOUSTON, TEXAS,           §
                                      §
                Defendant.            §

### MEMORANDUM OPINION AND ORDER

Plaintiff, Michael Gregg ("Plaintiff" or "Gregg"), brings this action against defendant, the City of Houston ("Defendant" or "COH"), for engaging in employment discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 et seq., and for violating rights guaranteed by the First and Fourteenth Amendments to the United States Constitution pursuant to 42 U.S.C. § 1983. Pending before the court is Defendant's Motion for Summary Judgment ("Defendant's MSJ") (Docket Entry No. 29). For the reasons set forth below, the Defendant's MSJ will be denied.

### I.   Factual Background[1]

The summary judgment evidence establishes that Gregg is a male law enforcement officer who has been employed by the Houston Police

---

[1]The factual background is derived from the Statement of Undisputed Facts in Defendant's MSJ, Docket Entry No. 29, pp. 11-15, the Statement of Facts in Plaintiff's Response to Defendant's Motion for Summary Judgment ("Plaintiff's Response"), Docket Entry No. 32, pp. 16-36, and other individually cited instruments included in the summary judgment record. Page numbers for docket entries in the record refer to the pagination inserted at the top of the page by the court's electronic filing system.

Department ("HPD") since 2008.  In 2012, he transferred to the Child Sexual Assault Unit ("CSAU") to work as an investigator.  In August of 2014 Michelle McCormick ("McCormick") joined the CSAU as an investigator.

In August of 2014 Sergeant Jeanette Perales ("Perales") was the CSAU's investigative supervisor, and Sergeant Shandra White was the CSAU's administrative supervisor.

McCormick regularly made comments with sexual content or connotations.  Perales held several meetings to remind CSAU members that HPD policy prohibited sexual harassment.  On January 27, 2015, Perales sent an email to CSAU members reminding them that sexual harassment was not only inappropriate but also a violation of HPD policy, listing examples of sexual harassment, and stating that

> [e]mployees who believe they are subjects of sexual harassment or who witness the same, have the responsibility to report the conduct immediately in accordance with department policy pursuant to General Order 300-11.  Although employees may utilize any of the reporting methods listed in General Order 300-11, the preferred method for employees to report prohibited conduct is through the Employee Relations Section of the Alternative Dispute Resolution Office (ADR).[2]

General Order 300-11 addresses Discrimination, Harassment, and Other Prohibited Conduct and bears an issue date of September 9, 2010.[3]  On April 28, 2015, Sergeant Perales resent the same email to CSAU members.[4]

_____

[2]Exhibit D to Defendant's MSJ, Docket Entry No. 29-4, p. 3. <u>See also</u> Exhibit 2, Attachment A to Plaintiff's Response, Docket Entry No. 32-3, p. 30 (same).

[3]Exhibit 1, Attachment A to Plaintiff's Response, Docket Entry No. 32-1, pp. 1-22.

[4]Exhibit 2, Attachment I to Plaintiff's Response, Docket Entry
(continued...)

During a mandatory training held for CSAU members on September 27, 2016, Officer L. Donovan ("Donovan") took a picture of Officer R. Kelley ("Kelley") with his eyes closed, and sent the picture by text to others in attendance.  Kelley was sitting next to the plaintiff who was also visible in the picture.  A few days later plaintiff told Sergeant White that upon receiving the photograph of Officer Kelley during the training, Officer McCormick enlarged the section of the picture that showed plaintiff's crotch, called out plaintiff while holding her phone up for all to see, and pointed at plaintiff's crotch while making "ooh" and "ah" sounds.[5]  Sergeant White directed plaintiff to file a complaint against McCormick at HPD's ADR office, which he did on October 3, 2016.[6]

Plaintiff's ADR complaint against McCormick was forwarded to HPD's Internal Affairs Division ("IAD"), and almost immediately both plaintiff and McCormick were given "no contact" orders.[7]  On October 6, 2016, the IAD investigator, H.A. Chavez ("Chavez"), sent

---

[4](...continued)
No. 32-4, pp. 18-19.

[5]Declaration of Michael Gregg ("Gregg Declaration"), pp. 8-9 ¶¶ 16-17, Exhibit 2 to Plaintiff's Response, Docket Entry No. 32-3, pp. 9-10 ¶¶ 16-17.  See also Plaintiff's ADR Complaint, Exhibit F to Defendant's MSJ, Docket Entry No. 29-6, p. 4; and Investigation Summary, p. 1, Exhibit H to Defendant's MSJ, Docket Entry No. 29-8, p. 1.

[6]Gregg Declaration at 9 ¶ 17, Docket Entry No. 32-3, p. 10 ¶ 17.  See also Administrative Statement of Shandra White, Exhibit E to Defendant's MSJ, Docket Entry No. 29-5, pp. 19-20.

[7]Exhibit G to Defendants' MSJ, Docket Entry No. 29-7.

-3-

complaint notifications to McCormick and other members of the CSAU notifying them that plaintiff had filed a complaint alleging sexual harassment in which they had been involved or witnessed, and ordering them not to discuss the incident with anyone other than him and their own attorneys.  Chavez also advised them not to have avoidable contact with the plaintiff until they received notification that the investigation had been completed.[8]  In addition to the statement that plaintiff provided, the IAD investigation included administrative statements from at least three sergeants and 14 other officers.[9]  On December 20, 2016, Chavez issued a report recommending that charges against McCormick be sustained for "Prohibited Workplace Conduct" and "Sexual Harassment" in violation of HPD General Order 300-11.[10]

On February 8, 2017, Chairman of the Administrative Disciplinary Committee, M.A. Dirden, notified HPD's Chief, Art Acevedo, that "it is the Committee's opinion that discipline for Officer McCormick falls within Category E, but believe the discipline should be less than an indefinite suspension.  The vote

---

[8]See Complaint Notifications sent to Officers McCormick, Donovan, Keys, Sanchez, and Sergeant Perales, Exhibit 1, Attachment J to Plaintiff's Response, Docket Entry No. 35, pp. 2-6.

[9]See Officer Notification, Exhibit 1, Attachment J to Plaintiff's Response, Docket Entry No. 35, p. 24.

[10]Investigation Summary, p. 9, Exhibit H to Defendant's MSJ, Docket Entry No. 29-8, p. 10.  See also Exhibit 1, Attachment J to Plaintiff's Response, Docket Entry No. 35, pp. 29-33 (same).

for the recommendation of a multiple-day temporary suspension in lieu of termination was unanimous."[11]  In March of 2017 McCormick agreed to a seven day suspension for "fail[ing] to comply with Houston Police Department rules and regulations regarding CONDUCT AND AUTHORITY,"[12] based on the fact that "[i]nvestigation revealed that Officer McCormick failed to exercise sound judgment when she made inappropriate comments while on-duty."[13]

On March 31, 2017, plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that he was sexually harassed by Officer McCormick and that he was retaliated against for reporting the alleged harassment.[14]  Plaintiff alleged <u>inter alia</u> that he is

> now considered to be a department "snitch" and most officers in the squad no longer want to work with me. According to Sgt. Roberson, one male officer has described me as a "bitch," and said I was "less than a man."  Most of the members of the squad now avoid me, I am not welcome when they socialize or share lunch breaks. And when I need someone to go with me to interview an adult suspect, a witness, or a juvenile, my co-workers are just not available any more to go with me.  I have had to do several interviews of adult suspects alone,

---

[11]Letter to Chief Acevedo, Exhibit 1, Attachment J to Plaintiff's Response, Docket Entry No. 35, p. 37.

[12]Agreed Seven-Day Suspension, p. 1, Exhibit I to Defendant's MSJ, Docket Entry No. 29-9, p. 2.  <u>See also</u> Employee Resume Report, Exhibit J to Defendant's MSJ, Docket Entry No. 29-10.

[13]Agreed Seven-Day Suspension, p. 2, Exhibit I to Defendant's MSJ, Docket Entry Nos. 29-9, p. 3.

[14]Charge of Discrimination, Exhibit B to Defendant's MSJ, Docket Entry No. 29-2.

which is not how we typically do these interviews.  For safety reasons, we have always had two officers present when interviewing the adult suspects.[15]

On April 24, 2017, Captain Angelo sent an email to his lieutenants stating that "recent issues" prompted him to send the email asking them to

> share with your respective sergeants and officers that whenever an investigator requests a second officer to assist with an interview/interrogation of a suspect, they are expected to assist the primary investigator. Although there is nothing that I have found in our SOP's which requires two officers to interview/interrogate suspects, this decision is left up to the individual investigator.
>
> However, what is not acceptable is for someone to request assistance from their fellow officer and they do not receive it.  The overarching theme is the safety of our officers and not to put our personal differences ahead of our mission.  The work we do in S[pecial] V[ictims] D[ivision] is too important to allow whatever disagreements we may have with each other to take over and dictate who we will or will not help, and I cannot nor will not tolerate this behavior in SVD.  The overwhelming majority of our officers are doing what they are supposed to, however, due to recent issues it has become necessary for me to put this directive out.[16]

After filing his EEOC charge, plaintiff began seeing an HPD psychologist who on May 31, 2017, recommended that he be placed on light duty for 45 days.  The letter explained that

---

[15]Id. at pp. 2-3 ¶ 10, Docket Entry No. 29-2, pp. 3-4 ¶ 10. See also Charge of Discrimination Second Supplement filed on November 14, 2017, Exhibit 2, Attachment B to Plaintiff's Response, Docket Entry No. 32-3, pp. 32-37.

[16]Email, Exhibit 2 Attachment D to Plaintiff's Response, Docket Entry No. 32-4, p. 4.

[i]n the last several months he has continued to experience repeated exposure to chronic and pervasive stressors in his current work environment of which he has no control.  As a result, Officer Gregg has begun to exhibit symptoms related to critical incident stress of which may have a significant impact on his occupational functioning.  Although Officer Gregg is capable and competent to conduct his assigned work duties, his current affective and cognitive resources may be temporarily compromised, thereby having the potential to negatively impact his work productivity.[17]

Based on the psychologist's recommendation, HPD reduced plaintiff's caseload for 45 days beginning in June of 2017.[18]

On July 17, 2017, Captain Angelo wrote an email to Ann Spiegel ("Spiegel") with the HPD Chief's legal division asking that plaintiff be transferred "if he cannot resume full duties and a full caseload as a CSAU investigator."[19]

On August 4, 2017, plaintiff met with Captain Angelo, Lieutenant Colburn, and Sergeant Alvarez to discuss his duty status, and told his commanders that he was willing to try another position and he identified three possibilities: Juvenile Crimes Investigator, Crime Stoppers, and Vice Officer.[20]  After the meeting

---

[17]Letter to Sergeant Shandra White from Staff Psychologist, Meagan N. Houston, and Police Administrator, Stephen Tate, Exhibit L to Defendant's MSJ, Docket Entry No. 29-12.

[18]Letter to Sergeant Shandra White from Lieutenant John Colburn, Exhibit M to Defendant's MSJ, Docket Entry No. 29-13.

[19]See July 17, 2017, Email from David Angelo, Exhibit 1, Attachment E, Docket Entry No. 32-2, p. 11.

[20]Gregg Declaration, p. 18 ¶ 32, Exhibit 2 to Plaintiff's Response, Docket Entry No. 32-3, p. 19 ¶ 32.

Captain Angelo sent Spiegel an email stating that plaintiff was willing to transfer to any one of three different divisions, and that "[i]n the interest of both Officer Gregg and SVD divisional operations, I am requesting Officer Gregg be transferred from SVD sooner rather than later and he is on board with this decision."[21] Spiegel informed plaintiff's counsel that HPD wanted plaintiff to dismiss his claims in exchange for a transfer.[22]

On September 8, 2017, Captain Angelo and Lieutenant Colburn presented plaintiff with a letter signed by Assistant Chief Dobbins informing him that he was being involuntarily transferred to HPD's Juvenile Division effected September 9, 2017.[23]  At the Juvenile Division plaintiff was instructed to report to the Intake Unit where he learned that he would no longer work the day shift Monday through Friday with weekends off but, instead, would work the evening shift with days off during the week.[24]  Because plaintiff no longer held an investigative position, he stopped receiving investigator pay, but because he no longer worked the day shift

---

[21]Exhibit 2, Attachment E to Plaintiff's Response, Docket Entry No. 32-2, p. 11.

[22]Declaration of Margaret A. Harris, pp. 1-2 ¶¶ 5-6, and Attachments A and B thereto, Exhibit 3 to Plaintiff's Response, Docket Entry No. 32-5, pp. 3-4 ¶¶ 5-6, and pp. 6, 9-11.

[23]Exhibit N to Defendant's MSJ, Docket Entry No. 29-14.  See also September 8, 2017, Email from Angelo to Dobbins and Spiegel informing them that plaintiff had received notice of transfer, Exhibit 1, Attachment G, Docket Entry No. 32-2, p. 17.

[24]Gregg Declaration, p. 24 ¶ 44, Exhibit 2 to Plaintiff's Response, Docket Entry No. 32-3, p. 25 ¶ 44.

with weekends off, he began receiving differential pay for working the evening shift and weekend pay.[25]   Plaintiff held his position at the Juvenile Intake Unit until July of 2018 when he applied for and received a voluntary transfer to sex offender registration.[26]

On October 20, 2017, plaintiff's lieutenant in the Juvenile Division handed him an employee efficiency rating, also known as a JPR, covering the prior six months during which he worked in the CSAU, which was signed by his former supervisor, Sergeant Alvarez.[27] The JPR stated that plaintiff was among the lowest performers in the unit, that after receiving charges from the District Attorney's Office, he did not file the warrants in a timely manner, and that he displayed an inability to properly care for investigations by mishandling witness statements.[28]

## II. **Standard of Review**

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment.   Fed. R. Civ. P. 56.   Disputes about

---

[25]Oral Deposition of Michael Gregg ("Gregg Deposition"), pp. 15:20-16:18, Docket Entry No. 29-1, pp. 5-6.

[26]Id. at 18:2-17, Docket Entry No. 29-1, p. 7.

[27]Defendant's MSJ, Docket Entry No. 29, p. 14 (citing Exhibit P to Defendant's MSJ, Docket Entry No. 29-16).   See also Plaintiff's Response, Docket Entry No. 32, pp. 35-36 (citing Gregg Declaration, pp. 23-24, Exhibit 2, Docket Entry No. 32-3, pp. 24-25, and Attachment R thereto).

[28]Exhibit P to Defendant's MSJ, Docket Entry No. 29-16.

material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2511 (1986). The Supreme Court has interpreted the plain language of Rule 56 to mandate the entry of summary judgment "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2552 (1986). A party moving for summary judgment "must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (quoting Celotex, 106 S. Ct. at 2553). If the moving party meets this burden, the nonmovant must go beyond the pleadings and show by admissible evidence that facts exist over which there is a genuine issue for trial. Id. Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy that is, when both parties have submitted evidence of contradictory facts." Little, 37 F.3d at 1075. "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 2110 (2000).

### III. <u>Analysis</u>

The COH moves for summary judgment on all of plaintiff's claims arguing that claims based on actions that occurred before May 31, 2016, <u>i.e.</u>, more than 300 days before plaintiff filed his charge of discrimination with the EEOC, are time-barred; that plaintiff cannot establish that he was subjected to a hostile work environment based on sex; and that plaintiff cannot meet his burden either to establish a prima facie case of retaliation or to rebut defendant's legitimate, non-discriminatory reasons for the disputed employment actions.[29]   Plaintiff responds that genuine issues of material fact require a trial.[30]

### A.   Applicable Law

1.   <u>Title VII</u>

Title VII protects individuals from discrimination by an employer "because of such individual's race, color, religion, sex, or national origin."   42 U.S.C. § 2000e-2(a)(1).   Title VII prohibits both sexual harassment that creates a hostile working environment, and retaliation for complaining of sexual harassment. 42 U.S.C. § 2000e-3(a).   <u>See University of Texas Southwestern Medical Center v. Nassar</u>, 133 S. Ct. 2517, 2522 (2013).

---

[29]Defendant's MSJ, Docket Entry No. 29.   <u>See also</u> Defendant's Reply Supporting Motion for Summary Judgment ("Defendant's Reply"), Docket Entry No. 38.

[30]Plaintiff's Response, Docket Entry No. 32, p. 9.

2.  <u>Section 1983</u>

Title VII and § 1983 claims may be asserted concurrently, as plaintiff has done in this case.  "When . . . unlawful employment practices encroach, not only on rights created by Title VII, but also on rights that are independent of Title VII, Title VII ceases to be exclusive.  At this point, § 1983 and Title VII overlap, providing supplemental remedies."  <u>Southard v. Texas Board of Criminal Justice,</u> 114 F.3d 539, 549 (5th Cir. 1997) (quoting <u>Johnston v. Harris County Flood Control District,</u> 869 F.2d 1565, 1576 (5th Cir. 1989), <u>cert. denied,</u> 110 S.Ct. 718 (1990)). Employment discrimination claims brought under §1983 are analyzed under the evidentiary framework applicable to claims arising under Title VII.  <u>See Tanik v. Southern Methodist University,</u> 116 F.3d 775, 775 (5th Cir. 1997) (per curiam) ("The elements of the Title VII claim and the § 1983 claim are identical.  The court evaluates these claims according to a single analysis.").

**B.  Defendant's MSJ Based on Limitations Will be Denied**

Citing <u>National Railroad Passenger Corp. v. Morgan,</u> 122 S. Ct. 2061 (2002), the COH argues that plaintiff's claims based on acts occurring prior to May 31, 2016, are time barred.[31]  Asserting that

---

[31]Defendant's MSJ, Docket Entry No. 29, pp. 15-17.  <u>See also</u> Defendant's Reply, Docket Entry No. 38, pp. 2-4 (asserting that "Plaintiff's sexual harassment claim may not be based on any acts that allegedly occurred during the tenure of Sergeant Perales").

-12-

plaintiff filed his initial charge with the EEOC and the Texas
Workforce Commission on March 31, 2017, and that any discrete acts
occurring more than 300 days prior to that date are time-barred,
the COH argues that there is no evidence to support any continuing
unlawful practice which occurred prior to May 31, 2016.  Defendant
argues that while plaintiff identified the "latest" date as
September 27, 2016, he neither identified any "earliest" date nor
checked the "continuing action" box on his EEOC charge form.[32]
Defendant also argues that

> [w]hile Plaintiff complains that Officer McCormick made
> repeated comments containing sexual innuendo, McCormick
> was [plaintiff's] co-worker, not a manger.  As alleged by
> Plaintiff, [his] managing supervisor on 9/27/16 was
> Sgt. White.  See Complaint, ¶ 26.  White began
> supervising [plaintiff] in September 2015.  See id. ¶ 13.
> As a matter of law, any continuing action must have
> occurred, if at all, during the period when White was
> managing [plaintiff]. . . There is no evidence that any
> of the alleged harassing acts by McCormick occurred
> during that time frame.  On the contrary, Plaintiff
> contends the allegedly "objectionable behavior" by
> McCormick occurred during the period when their direct
> supervisor was Sergeant Jeanette Perales.  See Complaint,
> ¶¶ 7, 8.  Perales left the Special Victims Division,
> Child Sexual Abuse Unit on September 15, 2015, after
> which [plaintiff] and McCormick were supervised by
> Sgt. White and Sgt. T. Roberson.  Id. ¶ 13. . . Although
> Plaintiff contends that White and Roberson knew about
> McCormick's past behavior, there is no evidence or
> allegation that McCormick actually perpetuated any
> harassing acts during White and  Roberson's tenure until
> September 27, 2016.  Thus, the alleged past
> "objectionable behavior" of McCormick does not constitute
> the "same unlawful practice" as the September 27, 2016

---

[32]Defendant's MSJ, Docket Entry No. 29, p. 16.

incident which was the subject of [plaintiff]'s EEOC charge, and there is no continuing violation.[33]

Plaintiff responds that there is no merit to defendant's argument that his sexual harassment claim is time barred because

[a]s [he] stated in his [EEOC] Charge, the unlawful sexual harassment of which he complains began as early as August 2014 and continued through September 2016.  And the conduct was similar throughout the entire period — McCormick engaged in "inappropriate and lewd sexual comments and innuendos, . . . on a regular basis" and stopped by his desk "practically every day and made inappropriate and unwelcome comments."  These actions are sufficiently similar, occurred with great frequency, and involved the same perpetrator, all of which evidences that his complaint is about one continuous act of harassment under the teachings of the <u>Morgan</u> case.[34]

1.   <u>Additional Law</u>

In <u>Morgan</u> the Supreme Court held that

a Title VII plaintiff raising claims of discrete discriminatory or retaliatory acts must file his charge within the appropriate time period — 180 or 300 days — set forth in 42 U.S.C. § 2000e-5(e)(1).  A charge alleging a hostile work environment claim, however, will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period.

122 S. Ct. at 2077.  The Court reasoned that "[h]ostile environment claims are different in kind from discrete acts.  Their very nature

---

[33]<u>Id.</u> at 16-17.

[34]Plaintiff's Response, Docket Entry No. 32, pp. 50-51 (citing EEOC Charge—Second Supplement filed on November 14, 2017, p. 1 ¶ 2, Exhibit 2, Attachment B, Docket Entry No. 32-3, p. 32).  <u>See also</u> EEOC Charge filed on March 31, 2017, Exhibit B to Defendant's MSJ, Docket Entry No. 29-2, p. 1 ¶ 2) (same).

involves repeated conduct." <u>Id.</u> at 2073. "The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." <u>Id.</u> Observing that "[a] hostile work environment claim is composed of a series of separate acts that collectively constitute one 'unlawful employment practice,'" <u>id.</u> at 2074, the Court explained that

> [t]he timely filing provision only requires that a Title
> VII plaintiff file a charge within a certain number of
> days after the unlawful practice happened. It does not
> matter, for purposes of the statute, that some of the
> component acts of the hostile work environment fall
> outside the statutory time period. Provided that an act
> contributing to the claim occurs within the filing
> period, the entire time period of the hostile environment
> may be considered by a court for the purposes of
> determining liability.

<u>Id.</u>

In <u>Stewart v. Mississippi Transportation Commission,</u> 586 F.3d 321, 328-30 (5th Cir. 2009), the Fifth Circuit explained that the continuing violation doctrine applied to hostile work environment claims in <u>Morgan</u> is limited in three ways. "First, the plaintiff must demonstrate that the 'separate acts' are related, or else there is no single violation that encompasses the earlier acts." <u>Id.</u> at 328 (citing <u>Morgan,</u> 122 S.Ct. at 2075-76). "Second, the violation must be continuing; intervening action by the employer, among other things, will sever the acts that preceded it from those subsequent to it, precluding liability for preceding acts outside

-15-

the filing window." Id. (citing Morgan, 122 S.Ct. at 2075). "Third, the continuing violation doctrine is tempered by the court's equitable powers, which must be exercised to 'honor Title VII's remedial purpose "without negating the particular purpose of the filing requirement."'" Id. (quoting Morgan, 122 S. Ct. at 2076) (quoting Zipes v. Trans World Airlines, Inc., 102 S. Ct. 1127, 1135 (1982)). In Heath v. Board of Supervisors for Southern University and Agricultural and Mechanical College, 850 F.3d 731 (5th Cir. 2017), the Fifth Circuit restated and reaffirmed the Stewart court's analysis of the continuing violation doctrine and its three limitations. Id. at 738-41. The Fifth Circuit also recognized that "[t]he continuing violation doctrine applies the same to Title VII hostile work environment claims as it does to such claims brought under section 1983." Id. at 739.

2.  Application of the Law to the Undisputed Facts

Applying the standards expressed in Stewart, 586 F.3d at 328, to the facts of this case, the court concludes that the continuing violation doctrine applies here.

(a)  The Alleged Acts of Harassment are Related

Plaintiff contends that the incident that occurred at the mandatory training on September 27, 2016 — during which he alleges that Officer McCormick held up a photo of his crotch while making

-16-

"ooh" and "ah" sounds — is part of a single hostile work environment that commenced in August of 2014 when McCormick began working in the CSAU.   Because each of the separate comments and acts that plaintiff alleges collectively created a hostile work environment involved the same types of sexually explicit conduct and were perpetrated by the same person, McCormick, the court finds — and the COH does not dispute — that McCormick's conduct on September 27, 2016, was related to the sexually explicit conduct that McCormick directed to plaintiff more than 300 days earlier, i.e., from the time she joined the CSAU in August of 2014.

(b)   The Alleged Harassment Was Continuing

Citing Morgan, 122 S. Ct. at 2076, and Heath, 850 F.3d at 731, defendant argues that separate acts of harassment alleged to have occurred before and after the 300 day filing period do not constitute a continuing violation because the alleged harassment was severed by the supervisory change that occurred in September of 2015 when Sergeant Perales left and Sergeant White become both plaintiff's and McCormick's immediate supervisor.[35]   Asserting that "the focus in a continuing violation inquiry is whether 'the same supervisors were involved' in managing the working conditions at the time of the pre- and post-limitations incidents,"[36] the COH argues that

---

[35]Defendant's MSJ, Docket Entry No. 29, p. 16.

[36]Defendant's Reply, Docket Entry No. 38, p. 3.

[t]he change in supervision from Sgt. Perales to
Sgt. White broke any connection between these events.
Any alleged managerial negligence by Sgt. Perales
occurred outside of the statutory limitations period and
is time-barred.  The City is entitled to summary judgment
as to any alleged sexual harassment which occurred under
the supervision of Sgt. Perales.[37]

The COH has failed to cite any authority holding that a change
in supervisor — alone — is sufficient to sever related acts of
harassment and thus preclude liability for acts of harassment that
occurred outside of the filing window.  In Morgan the Supreme Court
affirmed the Court of Appeals finding that a continuing violation
existed because "the pre- and post-limitations period incidents
involve[d] the same type of employment actions, occurred relatively
frequently, and were perpetrated by the same managers."  122 S. Ct.
at 2076.  In Heath, 850 F.3d at 740, the Fifth Circuit quoted this
passage from Morgan in support of its conclusion that the pre- and
post-limitations acts committed by the same supervisor were
related, not whether they were continuing.  Morgan and Heath are
both distinguishable because they harassment at issue was
perpetrated by a supervisor not a co-worker.  A change of
supervisor can — but does not necessarily — constitute an
intervening action by an employer sufficient to sever the acts that
preceded it from those subsequent to it, thus precluding liability
for preceding acts outside the filing window.

---

[37]Id. at 3-4.

In Stewart, 586 F.3d at 328-30, for example, the court held that plaintiff's reassignment away from a supervisor who had harassed her, constituted an intervening action that cut off the employer's liability for harassment that preceded the reassignment. The court explained that

> [i]n October 2004, after Stewart reported [her supervisor's] inappropriate conduct to his supervisor, MDOT promptly reprimanded [her supervisor] and, crucially, reassigned Stewart from [his] supervision. Stewart concedes that these acts ended [her supervisor's] harassment for a period of sixteen months, until she was brought back under his supervision. They also proved satisfactory, at the time, to Stewart, who declined to pursue other corrective opportunities once she had been reassigned.

Id. at 329.  The court held that "[b]ecause MDOT's prompt remedial action in 2004 was an intervening action under Morgan, Stewart may not rely on the continuing violation doctrine to hold MDC liable for any pre-October 2004 harassment."  Id. at 330.  The Fifth Circuit's holding in Stewart makes clear that an intervening action sufficient to sever related acts of harassment is a prompt remedial action that ends the harassment.

Plaintiff's own testimony, the administrative statements of many of his peers, including Officer McCormick, and the report that resulted from the IAD investigation of plaintiff's complaint, all constitute evidence that McCormick regularly engaged in inappropriate, sexually explicit conduct both before and after the supervisory change the COH argues constitutes an intervening action.  Because the summary judgment record contains no evidence either that Sergeant Perales was replaced by Sergeant White as a

-19-

remedial action, or that the change in supervisors caused any change in McCormick's conduct, the court is not persuaded that the supervisory change constitutes an intervening action sufficient to sever the acts of alleged harassment that preceded it from those that occurred subsequent to it, thus precluding the COH's liability for acts that occurred outside of the filing window.  Because the summary judgment records contains evidence showing that the separate acts of alleged harassment that occurred both before and after Sergeant Perales left the CSAU and Sergeant White became the immediate supervisor for both plaintiff and McCormick, involved the same type of sexually explicit conduct, occurred regularly, <u>i.e.</u>, on an almost daily basis, and were perpetrated by the same person, the court concludes that the alleged harassment was continuing.

(c)  The Court's Equitable Powers Are Not Implicated

Defendant has not pointed to any equitable consideration that should prevent the court from considering the full scope of the continuing conduct.  <u>See Stewart,</u> 586 F.3d at 328.

3.  <u>Conclusions</u>

Based on the findings made in §§ III.B.2(a)-(b), above, the court concludes that plaintiff's hostile work environment claim is a claim for a continuing violation, and that the COH is not entitled to summary judgment that plaintiff's claims based on acts occurring prior to May 31, 2016, are time barred.

-20-

**C.   Defendant's MSJ on Plaintiff's Claim for Hostile Work Environment Based on Sex Will be Denied**

Plaintiff's hostile work environment claim is based on allegations that beginning in August of 2014, his female co-worker, Officer McCormick, made "inappropriate and lewd sexual comments and innuendos directed towards and/or deliberately in [his] presence . . ., and she did so on a regular basis,"[38] that McCormick's "constant objectionable behavior was well-known by [plaintiff's] co-workers and by his immediate supervisor, Sgt. Perales, who was also McCormick's supervisor,"[39] that "Perales openly acknowledged to [plaintiff] that she knew about McCormick's misconduct,"[40] that "Perales took a few ineffective steps that     were her token attempts to stop the harassment,"[41] and that "Perales transferred to another HPD division in September 2015, after which [plaintiff] was supervised by Sgt. T. Roberson and Sgt. Shaundra White [both of whom were] well aware of McCormick's behavior."[42]

---

[38]Plaintiff's Complaint, Docket Entry No. 1, p. 3 ¶ 7.

[39]Id. ¶ 8.

[42]Id. at 5 ¶ 13 (alleging that Sergeant Roberson was well aware of McCormick's behavior).  See also id. ¶ 14 (alleging that Sergeant White was well aware of McCormick's behavior).

1.  <u>Additional Law</u>

The elements of a hostile work environment claim depend on the status of the harasser.  When an alleged harasser is the plaintiff's co-worker, not his supervisor, "the employer is liable only if it was negligent in controlling working conditions." <u>E.E.O.C. v. Boh Brothers Construction Co., LLC</u>, 731 F.3d 444, 452 (5th Cir. 2013) (en banc) (quoting <u>Vance v. Ball State University</u>, 133 S. Ct. 2434, 2439 (2013)).  To establish a Title VII hostile work environment claim plaintiff must show that he (1) belongs to a protected group; (2) was subjected to unwelcome harassment; (3) the harassment was based on his sex; (4) the harassment affected a term, condition, or privilege of his employment; and (5) the COH knew or should have known of the harassment and failed to take prompt remedial action. <u>Hernandez v. Yellow Transportation, Inc.</u>, 670 F.3d 644, 651 (5th Cir.), <u>cert. denied sub nom. Ketterer v. Yellow Transportation, Inc.</u>, 133 S. Ct. 136 (2012)(quoting <u>Ramsey v. Henderson</u>, 286 F.3d 264, 268 (5th Cir. 2002)).

For harassment to affect a term, condition, or privilege of employment, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." <u>Id.</u> "Workplace conduct 'is not measured in isolation.'" <u>Id.</u> (quoting <u>Ramsey</u>, 286 F.3d at 268).

> In order to deem a work environment sufficient hostile, "all of the circumstances must be taken into consideration." . . . This includes "the frequency of the discriminatory conduct; its severity; whether it is

-22-

> physically threatening or humiliating, or a mere
> offensive utterance; and whether it unreasonably
> interferes with an employee's work performance."

Id. (quoting Ramsey, 286 F.3d at 268). "To be actionable, the work
environment must be 'both objectively and subjectively offensive,
one that a reasonable person would find hostile or abusive, and one
that the victim in fact did perceive to be so.'" Id. (quoting
Faragher v. City of Boca Raton, 118 S. Ct. 2275, 2283 (1998)).
"[The] standards for judging hostility are sufficiently demanding
to ensure that Title VII does not become a 'general civility
code.'" Faragher, 118 S. Ct. at 2283-84. "Properly applied,
[these standards] will filter out complaints attacking 'the
ordinary tribulations of the workplace, such as the sporadic use of
abusive language, gender-related jokes, and occasional teasing.'"
Id. at 2284 (citation omitted). "[The] conduct must be extreme to
amount to a change in the terms and conditions of employment." Id.
At issue is whether the conduct alleged created a hostile work
environment that "exposed [plaintiff] to disadvantageous terms or
conditions of employment to which members of the other sex [were]
not exposed." Oncale v. Sundowner Offshore Services, Inc., 118 S.
Ct. 998, 1002 (1998).


2.   Application of the Law to the Undisputed Facts

The COH does not dispute that plaintiff belongs to a protected
group (male), but does dispute that the alleged harassment was

-23-

unwelcome, based on plaintiff's sex, or sufficiently severe or pervasive to affect a term, condition, or privilege of his employment.  The COH also disputes that it knew or should have known of the harassment but failed to take prompt remedial action.[43] Plaintiff responds that the harassment was sufficiently pervasive to effect a term or condition of his employment, and that the COH knew or should of known of the harassment but failed to stop it.[44]

        (a)  Plaintiff  Has  Cited  Evidence  Capable  of Establishing  that  the  Alleged  Harassment  Was Unwelcome and Based on His Sex

Asserting that "there is no evidence that McCormick's alleged inappropriate and lewd sexual comments and innuendo were directed towards [plaintiff] based on his membership in a protected class (male),"[45] the COH argues that "McCormick was an 'equal opportunity offender'[; f]emales as well as males reported that McCormick used sexual language in their presence or acted flirtatiously towards

---

[43]Defendant's MSJ, Docket Entry No. 29, pp. 18-23.  <u>See also</u> Defendant's Reply, Docket Entry No. 38, pp. 4-5.  The COH also argues that "any complaint based on the alleged comments and innuendos is time-barred," Defendant's MSJ, Docket Entry No. 29, p. 18, but for the reasons stated in § III.B, above, the court has already concluded that summary judgment record contains sufficient evidence to establish that plaintiff's hostile work environment claim is a claim for a continuing violation that began in 2014 and continued to and included the incident that occurred at the mandatory training on September 27, 2016.

[44]Plaintiff's Response, Docket Entry No. 32, pp. 44-49.

[45]Defendant's MSJ, Docket Entry No. 29, p. 19.

them. . . Thus, McCormick's actions were not discriminatory and did

not violate Title VII."[46]

Citing <u>Oncale,</u> 118 S. Ct. at 1001, for its holding that Title

VII's prohibition of discrimination 'because of . . . sex' protects

men as well as women," plaintiff argues that he "will offer

evidence to the jury that McCormick's behavior toward him was

unwelcome; . . . he avoided her, he averted his eyes, he tried to

ignore her, and he complained about it to his supervisors."[47]

Plaintiff argues that

> [h]is evidence is also sufficient to show that the
> harassment to which he was subjected was because of his
> gender.   Evidence that an individual of one gender
> engages in sexually inappropriate conduct and makes
> sexually inappropriate remarks to someone of the opposite
> gender does so because of the victim's sex.[48]

Plaintiff argues that

> [t]his is especially appropriate where, as here, there is
> no evidence that McCormick directed the same volume of
> sexually inappropriate misconduct toward anyone else,
> much less a female officer, as frequently or for as
> prolonged a period of time as she did toward
> [plaintiff].[49]

---

[46]<u>Id.</u> (citing IAD Investigate Report at Bates #0000655, 667-68,
674-75, 688, Exhibit E to Defendant's MSJ, Docket Entry No. 29-5,
pp. 9 (Officer Anny Vasquez's administrative statement), 21
(Officer Amie Flower's administrative statement), 22 (Officer
Kimberly Neal's administrative statement), and 35 (Officer Jocelyn
Wilson's administrative statement)).

[47]Plaintiff's Response, Docket Entry No. 32, pp. 45.

[48]<u>Id.</u>

[49]<u>Id.</u>

Plaintiff has presented substantial evidence to dispute the COH's contention that the alleged conduct was neither harassing nor based on his sex.  The conduct that plaintiff alleges constituted a hostile work environment includes the following:

- McCormick routinely made a point of getting [plaintiff]'s attention when she walked by and then, having done so, she would pointedly leer at his crotch.  At times, she did not say a single word; at other times, she would make only a sound, like "umph."

- McCormick often walked directly up to [plaintiff] as he sat at his desk and briefly rubbed his shoulders and neck area before walking away.

- McCormick frequently made comments or statements of a sexual or vulgar nature.  She has a unique ability to turn even the most innocuous of comments into a sexual innuendo.  In one conversation, for example, [plaintiff] mentioned a knob, like a door knob.  Immediately, McCormick said, "I bet you like getting your knob twisted."

- [Plaintiff] was on the elevator with McCormick at the end of a day and the elevator was almost full with students from the Kaplan training school, which shared the building.  It was a small elevator and [plaintiff] was at the back . . . McCormick, acting as though she was simply making room for the students, backed up close to him and, with one hand behind her back, she rubbed his body from mid-thigh up to near his groin/crotch area, and smiled.

- McCormick stood at [plaintiff]'s cubicle and simulated oral sex/fellatio on a [p]opsicle, gagging and making sure he could see her getting the complete popsicle in her mouth.

- [Plaintiff] was standing in his cubicle yawning and stretching and he was wearing an untucked shirt. Walking by, McCormick reached out her hand and touched his belly button/stomach (skin to skin).

-26-

- On 9/27/16, members of the squad were attending mandatory training and someone took a picture with their phone of an officer sitting next to [plaintiff]      and texted it to others in the training.  McCormick held up her phone and called out to [plaintiff] with the picture zoomed in on his crotch.  She was pointing to his crotch and making ooh and ah sounds.[50]

Moreover, the IAD investigation of plaintiff's complaint that McCormick sexually harassed him resulted in a "recommend[ation that] the conduct alleged, Sexual Harassment, be classified as SUSTAINED. . ."[51]  On this record, a reasonable jury could find that McCormick's alleged harassment was both unwelcome and directed at plaintiff because of his sex.  See Lauderdale v. Texas Department of Criminal Justice, Institutional Division, 512 F.3d 157, 163 (5th Cir. 2007) (finding that the second and third elements of a hostile work environment claim were satisfied by the employer's finding that the alleged harasser had engaged in "Discourteous Conduct of a Sexual Nature").

>    (b)  Plaintiff Has Cited Evidence Capable of Establishing that the Alleged Harassment Effected a Term, Condition, or Privilege of His Employment

Arguing that the alleged harassment did not affect a term, condition, or privilege of plaintiff's employment, the COH argues

---

[50]Plaintiff's Response, Docket Entry No. 32, pp. 17-18 (citing Gregg Declaration, pp. 3 ¶ 5 and 8 ¶ 16, Exhibit 2 to Plaintiff's Response, Docket Entry No. 32-3, pp. 4 ¶ 5 and p. 9 ¶ 16.

[51]Investigative Summary, p. 7, Exhibit H to Defendant's MSJ, Docket Entry No. 29-8, p. 8.

-27-

that plaintiff's allegations of sexual harassment are not
sufficiently severe or pervasive to support a hostile work
environment claim.[52]   The COH argues that

> Plaintiff has no concrete examples of frequent harassment
> by McCormick within the 300-day statutory time frame.
> The only timely complaint, that McCormick laughed while
> looking at a picture of [plaintiff]'s clothed penis area,
> is neither severe nor physically threatening.   There is
> no indication that McCormick's actions unreasonably
> interfered with [plaintiff]'s work performance such that
> they "destroyed [his] opportunity to succeed in the
> workplace." . . . Indeed, as noted above, [plaintiff]
> stated that he ignored McCormick's inappropriate comments
> until the "penis picture" incident, which never
> reoccurred after he reported it. . . Thus the alleged
> harassment was not severe or pervasive.[53]

Plaintiff responds that "[w]hile the City disagrees, [he] has
evidence that McCormick began engaging in sexually inappropriate
conduct toward and directing offensive sexual comments to him
without delay  and that misconduct continued on an almost daily
basis for the next two years."[54]

Contrary to the COH's argument, plaintiff has presented
evidence from which a reasonable jury could find that the
harassment complained of was both objectively and subjectively

---

[52]Defendant's MSJ, Docket Entry No. 29, pp. 19-21.   <u>See also</u>
Defendant's Reply, Docket Entry No. 38, pp. 4-5.

[53]Defendant's MSJ, Docket Entry No. 29, p. 21 (citing
Plaintiff's Statements included in the IAD Investigative Report,
Bates # 000649, 000651-652, Exhibit E to Defendant's MSJ, Docket
Entry No. 29-5, pp. 3, 5-6).

[54]Plaintiff's Response, Docket Entry No. 32, p. 17 (citing
Gregg Declaration, Exhibit B to Plaintiff's Response, Docket Entry
No. 32-3).

offensive, and sufficiently pervasive to affect a term, condition, or privilege of his employment. Evidence that the harassment plaintiff experienced was subjectively offensive is found in the complaints that he lodged with his supervisors, Sergeants Perales and White, the COH's ADR, and the EEOC. See Aryain v. Wal-Mart Stores Texas LP, 534 F.3d 473, 480 (5th Cir. 2008) (holding that female plaintiff's pursuit of harassment claims with both her employer and the EEOC would allow a jury to conclude that she perceived her working environment to be hostile or abusive).

In determining whether a work environment is objectively hostile or abusive courts look to the totality of the circumstances and examine "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Hernandez, 670 F.3d at 651. See also Harris v. Forklift Systems, Inc., 114 S. Ct. 367, 371 (1993) (harassment must be such that "the environment would reasonably be perceived, and is perceived, as hostile or abusive"). In Lauderdale, 512 F.3d at 164, the Fifth Circuit held that evidence of frequent but non-severe harassment was sufficiently pervasive to survive summary judgment. The relevant harassment in Lauderdale consisted of multiple phone calls during the plaintiff's shift from her supervisor for nearly four months. Id. at 161-62. While the calls indicated the supervisor's romantic interest in the

plaintiff, the call that was the most sexual in nature merely invited the plaintiff to travel to Las Vegas with the supervisor to "snuggle." Id. at 161. In reversing the district court's entry of summary judgment, the Fifth Circuit declared that frequent harassment can be sufficiently pervasive to create a hostile work environment even if the individual incidents of harassment were not severe. The court explained that

> [a]lthough the district court correctly noted that none of the incidents of alleged harassment rises to the level of severity we have required, the test — whether the harassment is severe or pervasive — is stated in the disjunctive. An egregious, yet isolated, incident can alter the terms, conditions, or privileges of employment and satisfy the fourth element necessary to constitute a hostile work environment. . . The inverse is also true: Frequent incidents of harassment, though not severe, can reach the level of "pervasive," thereby altering the terms, conditions, or privileges of employment such that a hostile work environment exists. Thus, "the required showing of severity or seriousness of the harassing conduct varies inversely with the pervasiveness or frequency of the conduct."

Id. at 163 (citations omitted). See also Harvill v. Westward Communications, L.L.C., 433 F.3d 428, 434-35 (5th Cir. 2005) (explaining that conduct need not be both severe and pervasive to be actionable under Title VII); LaDay v. Catalyst Technology, Inc., 302 F.3d 474, 483 (5th Cir. 2002)(same).

Viewing plaintiff's allegations in the light most favorable to him, as the court must, the court concludes that McCormick's behavior was pervasive. Plaintiff's testimony that McCormick's offensive conduct occurred regularly, i.e., on an almost daily

-30-

basis, is sufficient to establish that the offensive conduct was frequent enough to be found "pervasive."  Moreover, McCormick's unwelcome harassment was not confined to inappropriate comments, it also included inappropriate touching and embarrassing plaintiff in front of his peers such as when she held up a photo of plaintiff's crotch while making "ooh" and "ah" sounds during a mandatory training.  A reasonable jury could conclude from this evidence that the two years of sexually explicit comments and unwanted touching that plaintiff endured constitutes harassment that was both objectively offensive and sufficiently pervasive to alter a term, condition, or privilege of his employment.  See Lauderdale, 512 F.3d at 163.  See also Cherry v. Shaw Coastal, Inc., 668 F.3d 182, 189 (5th Cir.), cert. denied, 133 S. Ct. 162 (2012) (finding hostile work environment existed when plaintiff was subject to multiple months of unwanted sexual grabbing and explicit comments); Harvill, 433 F.3d at 435 (finding severe or pervasive harassment when, over seven months, a coworker grabbed a female employee, fondled her breasts and patted her buttocks numerous times, and rubbed his body against her).

    (c)   Plaintiff Cites Evidence Capable of Establishing that the COH Failed to Take Prompt Remedial Action

The COH argues that prompt remedial action was taken as soon as plaintiff complained about the alleged harassment.  The COH argues that

> [h]ere, [plaintiff] submitted a formal complaint about
> McCormick's actions to HPD's ADR Division and to IAD on
> Monday, October 3, 2016. . . . IAD immediately started an
> investigation. . . . Two days later, on October 5, 2016,
> the City issued an Order of No Contact requiring
> McCormick to "immediately cease any and all contact with
> [plaintiff]." . . . Additionally, the City moved
> McCormick out of the Children's Assessment Center ("CAC")
> building in Rice Village where [plaintiff] worked and to
> the Child Sex Abuse Unit's Mykawa location. . . .
> Plaintiff complains that, some unspecified time after she
> was moved to Mykawa, McCormick subsequently returned back
> to the CAC. . . . While McCormick was assigned to the
> third floor and [plaintiff] worked on the fourth floor,
> Plaintiff complains that he would still see her in the
> common areas. . . . However, Plaintiff does not allege
> that McCormick ever harassed him after October 3, 2016.[55]

Plaintiff responds that all of the supervisors he had from 2014 to 2016 knew about, but failed to stop, the harassment, and that while his formal complaint to ADR and IAD ended the harassment, the ensuing investigation, pursuant to which his co-workers were not only informed of his complaint but also required to respond to questions related to it, engendered hostility from his co-workers that jeopardized his safety, and hostility from his supervisors that caused him to experience an involuntary transfer from the CSAU.[56]

The undisputed evidence shows that Sergeant Perales who supervised plaintiff from 2014 to the fall of 2015, not only knew about McCormick's behavior, and took steps to insure that her

---

[55]Defendant's MSJ, Docket Entry No. 29, pp. 21-22.  See also Defendant's Reply, Docket Entry No. 38, p. 5.

[56]Plaintiff's Response, Docket Entry No. 32, pp. 18-33, 47-49.

subordinates were aware of HPD's sexual harassment policies, but
that she did not take any steps that stopped the harassment.  For
example, in a statement provided on October 10, 2016, as part of
the IAD investigation, plaintiff was asked, "Did you ever notify a
supervisor about [McCormick's] inappropriate comments?  If so, who
did you notify, and what was the supervisor's response and or
actions to remedy the situation?"  Plaintiff responded that

> I did not have to notify the first supervisor, Sgt. J.
> Perales.  In late 2014 or early 2015 she called myself
> and Officer Kelly into her office to inquire about the
> inappropriate activity/comments being made by Officer
> McCormick.  She appeared to be surprised by the degree of
> inappropriateness and I remember our squad having a brief
> meeting about sexual harassment in the office.  My squad
> also received an email on Jan. 27, 2015 about sexual
> harassment from Sgt. Perales . . . .  We have had no less
> than three meetings where sexual harassment was
> discussed.  Further, I believe that since that time there
> was a sexual harassment clause added to our JPR
> reviews.[57]

The administrative statement that Officer Kelley provided as
part of the IAD investigation of plaintiff's complaint corroborates
plaintiff's statements regarding his supervisors' knowledge of
McCormick's behavior.   In pertinent part Kelley stated that

> Officer McCormick has always made inappropriate comments
> in a joking manner.  On multiple occasions she has
> twisted conversations into sexual situations while in the
> office and supervisors have been notified and are aware
> of her actions.  Because they have always been informed
> about her actions, I never had to notify a supervisor
> about Officer McCormick's sexual references.  I have
> never been offended . . . and I always ignore them or
> excuse myself from the conversation.

_____

[57]Exhibit 2, Attachment G to Plaintiff's Response, Docket Entry
No. 32-4, p. 12.

> Yes, I do remember speaking about Officer McCormick's
> inappropriate comments with Sergeant Perales in which she
> asked if I or [plaintiff] as well [as] other officers
> were offended by her actions.  Sergeant Perales stated
> that she would handle the situation and sent out an email
> to entire squad regarding sexual harassment.
>
> . . .
>
> After the email was sent to our squad several meetings to
> which I cannot count were conducted in the break room in
> which sexual harassment was the focus.  In these meetings
> both Sergeant White and Sergeant Perales were present
> along with their respective officers assigned to them.
> No names were ever specifically named during the meeting
> but we were advised that sexual harassment would not be
> tolerated.
>
> The outcome of our squad meetings were general in which
> behavior would cease regarding Officer McCormick's sexual
> conversations but would continue several days after.  I
> did not notify a supervisor about [it] as I believed she
> would be disciplined for her behavior.[58]

The COH's argument that prompt remedial action was taken to prevent and/or correct any inappropriate behavior is contradicted not only by evidence that plaintiff's supervisors were aware of the harassment, but also that attempts to address the harassment by sending email and holding meetings at which the issue was addressed in general terms and failed to stop the harassment for more than days at a time.  Based on this evidence a reasonable fact finder could conclude that the COH know or should have known of the harassment but failed to take prompt remedial action.

---

[58]Excerpts from IAD File, Bates # COH_Gregg 000788, ¶¶ 9, 11 15-16, Exhibit 1 Attachment J to Plaintiff's Response, Docket Entry No. 35, p. 14, ¶¶ 9, 11 15-16.

3.   <u>Conclusions as to Hostile Work Environment Claim</u>

There is no reasonable basis to support granting the COH's MSJ on plaintiffs' hostile work environment claim.  Considering all the facts in the light most favorable to the plaintiff, genuine issues of material fact exist as to whether McCormick's pervasive, sexually charged conduct was directed at plaintiff because of his sex, was unwelcome, was subjectively and objectively offensive, and was sufficiently severe or pervasive to effect a term, condition, or privilege of the plaintiff's employment.  Genuine issues of material fact also exist as to whether the COH knew or should have known of the harassment but failed to take prompt remedial action to end the harassment.  Accordingly, the COH's MSJ on plaintiffs' hostile work environment claim will be denied.

**D.   Defendant's MSJ on Plaintiff's Retaliation Claim Will be Denied**

1.   <u>Additional Law</u>

Title VII protects employees from retaliation for exercising protected rights.  <u>See</u> 42 U.S.C. § 2000e-3.  <u>See also Aryain,</u> 534 F.3d at 484.   In order to establish a prima facie case of retaliation under Title VII plaintiff must show that (1) he engaged in activity protected by Title VII, (2) he suffered a materially adverse employment action, and (3) a causal connection exists between the protected activity and the materially adverse employment action.  <u>Aryain,</u> 534 F.3d at 484.   For purposes of a

-35-

Title VII retaliation claim, an adverse employment action is an action that could dissuade a reasonable worker from making or supporting a charge of discrimination. Id. (citing Burlington Northern & Santa Fe Railway Co. v. White, 126 S. Ct. 2405, 2409 (2006)). Once plaintiff establishes a prima facie case the burden shifts to the employer to articulate a legitimate non-retaliatory reason for the adverse employment action. Aryain, 534 F.3d at 484. "If the employer meets this burden of production, the plaintiff then bears the burden of proving that the employer's reason [for the adverse action] is a pretext for the actual retaliatory reason. Id. (citing McCoy v. City of Shreveport, 492 F.3d 551, 557 (5th Cir. 2017) (per curiam)). Plaintiff is required to demonstrate that the adverse employment action would not have occurred "but for" his protected activity. Nassar, 133 S. Ct. at 2533 ("Title VII retaliation claims must be proved according to traditional principles of but-for causation . . ."). To avoid summary judgment on his retaliation claim plaintiff must show "a conflict in substantial evidence on this ultimate issue," Hernandez, 670 F.3d at 660, i.e., whether the COH retaliated against plaintiff. "Evidence is 'substantial' if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." Id. (quoting Long v. Eastfield College, 88 F.3d 300, 308 (5th Cir. 1996)).

-36-

2.   Application of the Law to the Facts

(a)  Plaintiff Establishes a Prima Facie Case

The COH does not dispute that plaintiff engaged in protected activity by complaining to his immediate supervisor, Sergeant White, about the incident that occurred at the mandatory training on September 27, 2016, by filing a formal complaint of sexual harassment with HPD's ADR office on October 3, 2016, and by filing charges for gender discrimination and retaliation with the EEOC on March 31, 2017.  The COH argues, however, that plaintiff has not suffered any adverse employment action as a result of his protected activity, and that even if he did suffer an adverse employment action, there is no causal connection between the adverse employment action and his protected activity.[59]  Plaintiff responds that a reasonable jury could conclude that the cumulative effects of the retaliatory acts that he suffered after making his sexual harassment complaint was materially adverse and would dissuade a reasonable officer from making a sexual harassment complaint.[60]

**(1)  Plaintiff Has Cited Evidence Capable of Establishing that He Suffered a Materially Adverse Employment Action**

Citing inter alia, Welsh v. Fort Bend Independent School District, 941 F.3d 818, 827 (5th Cir. 2019), cert. denied, 141 S.

---

[59]Defendant's MSJ, Docket Entry No. 29, pp. 23-32.  See also Defendant's Reply, Docket Entry No. 38, pp. 5-9.

[60]Plaintiff's Response, Docket Entry No. 32, pp. 38-44.

Ct. 160 (2020), the COH argues that neither HPD's involuntary
transfer of plaintiff to Juvenile Intake nor the poor review that
plaintiff received on the JPR dated October 12, 2017, can serve as
the basis for his retaliation claim.[61]  In <u>Welsh</u> the Fifth Circuit
stated that "when determining whether an allegedly retaliatory
action is materially adverse, courts 'look to indicia such as
whether the action affected "job title, grade, hours, salary, or
benefits" or caused "a diminution in prestige or change in standing
among . . . coworkers."'"   <u>Id.</u>   (quoting <u>Paul v. Elayn Hunt</u>
<u>Correctional Center,</u> 666 F. App'x 342, 346 (5th Cir. 2016) (per
curiam) (quoting <u>Stewart,</u> 586 F.3d at 332)).   The COH argues that
as the Fifth Circuit stated in <u>Welsh</u> and other cases,

> a retaliatory employment action must create an objective
> difference in terms of the aggrieved employee's
> compensation, benefits, working conditions, job title,
> grade, hours or prestige in order to violate Title VII.
> . . . Plaintiff cannot establish any of these differences
> between the position at Juvenile Division and his prior
> position at the Children's Assessment Center.  Plaintiff
> remained a police officer receiving the same salary . .
> . While he stopped receiving investigator pay, he began
> receiving shift pay and weekend pay in an amount greater
> than what he received as investigator pay . . .
> Additionally, Plaintiff has presented no evidence that
> his position in the Juvenile Division was less
> prestigious than his prior position at the Child
> Assessment Center.  In fact, the evidence shows that
> routinely there is a waiting list of applicants for
> Juvenile Intake Officer position . . . Unlike these
> applicants, Plaintiff was not subject to interview nor
> did he have to wait on a waiting list.  Thus, no injury
> or harm can be shown.[62]

---

[61]Defendant's MSJ, Docket Entry No. 29, p. 28.

[62]<u>Id.</u> at 28-29.

Citing Plaintiff's Complaint, the COH argues that

> [i]t is [plaintiff's] contention that the JPR harmed his
> 'ability to be competitive in applying for transfers to
> a more desirable position.' . . . [Plaintiff's]
> contentions are nothing more than bare speculation.
>
> There is no evidence that a signed copy of the
> October 12, 2017[,] JPR ever appeared in [plaintiff's]
> personnel file or department resume. . . . Further, since
> October 12, 2017, [plaintiff] has put in for only one
> transfer, to sex offender registration, and he received
> that transfer . . . He has not put in any transfers to
> investigative positions . . . He does not know for sure,
> whether he would or would not get an investigative
> position if he applied.[63]

Citing <u>Johnson v. Halstead</u>, 916 F.3d 410, 421 (5th Cir. 2019),

plaintiff responds that

> [i]n a recent decision with facts similar to the evidence
> that [plaintiff] has to offer a jury in this case, the
> Fifth Circuit announced that it would have "no trouble"
> finding that the evidence was sufficient to show an
> actionable claim of retaliation when (1) the police
> officer had been transferred from a daytime shift during
> the week to a night shift that required him to work
> weekends; (2) the unit to which he was transferred was a
> widely-acknowledged inferior position; and (3) the
> officer lost income from an extra job he could no longer
> work due to that shift change.[64]

The summary judgment record contains undisputed evidence that
effective September 9, 2017, plaintiff was involuntarily
transferred from working day shifts with weekends off as a
investigator in the CSAU to working evening shifts with week days
off in Juvenile Intake.  In <u>Johnson</u> the police officer plaintiff

---

[63]<u>Id.</u> at 29.

[64]Plaintiff's Response, Docket Entry No. 32, p. 39.

experienced a substantially similar transfer "from the day shift in
Traffic Division . . . to Second Shift West Division, which [the
plaintiff] describe[d] as 'one of the worst shifts in the entire
police department.'" Id. at 415.  Analyzing the plaintiff's claim
that the transfer was in retaliation for having complained of
discrimination, the Fifth Circuit stated:  "He went from a daytime
shift during the week to a night shift on the weekend.  Just in
terms of that timing, either hours or days, the shift change could
dissuade an officer from making a discrimination complaint." Id.
at 421.  Because the involuntary transfer that plaintiff received
in September 2017 involved the same change from a daytime shift
during the week to a night shift on the weekend, the court
concludes that the transfer could reasonably be found to be a
materially adverse employment action because it would dissuade a
reasonable employee from making a charge of discrimination.[65]

> **(2)  Plaintiff Has Cited Evidence Capable of
> Establishing a Causal Connection Between His
> Protected Activity and a Materially Adverse
> Employment Action**

The COH argues that "[t]here is no evidence that Plaintiff's
protected activity was ever a consideration in his transfer to the
Juvenile Division."[66]  The COH argues that

---

[65]Plaintiff's Response, Docket Entry No. 32, pp. 38-41.

[66]Defendant's MSJ, Docket Entry No. 29, p. 30.

[i]n his email following a meeting with [plaintiff],
Captain Angelo specified the reasons for requesting that
[plaintiff] be transferred sooner rather than later.
Captain Angelo noted [plaintiff's] desire to leave the
Special Victims Division, the stress being placed on
other officers due to the extra case load imposed on them
as a result of [plaintiff's] light duty status, and the
fact that there was an active transfer list for the
Special Victims Division from which they could select a
replacement. . . . Thus, there is no causal connection to
Plaintiff's protected activity and his transfer to the
Juvenile Division.[67]

The COH argues that

Plaintiff likewise fails to show a causal connection
between a protected activity and the JPR he was handed on
October 12, 2017. Plaintiff claims the JPR was signed by
his supervisor Sergeant Alvarez. There is no evidence to
show that Sergeant Alvarez was aware that Plaintiff
participated in any protected activity. . . .Sergeant
Alvarez did not become [plaintiff's] supervisor until
April 8, 2017. Ex. U. This after Plaintiff filed his
EEOC Charge on March 31, 2017 and well after he filed his
complaint with IAD on October 3, 2016. Ex. B & F. In
fact, by the time Sergeant Alvarez became Plaintiff's
supervisor the IAD investigation had concluded and
Officer McCormick had been issued a seven-day suspension.
Ex. I. Thus, there is no causal connection to
Plaintiff's protected activity and the October 12, 2017,
JPR.[68]

Plaintiff responds that the COH's contention that

there is no evidence of any causal connection between
[his] sexual harassment complaint and []his involuntary
transfer to Juvenile Intake . . . may be one of the
boldest misstatements of the record the City presents in
its motion. As [plaintiff's] evidence will show, the
question of whether it might be best to transfer to
another unit came up because he was experiencing so much
retaliation from his colleagues as a result of his sexual
harassment complaint.[69]

---

[67]Id.

[68]Id. at 30-31.

[69]Plaintiff's Response, Docket Entry No. 32, p. 27.

Plaintiff argues that "shortly after refusing to dismiss his sexual harassment claim, [he] was transferred to one of the least prestigious units in HPD — a transfer that cost him thousands of dollars."[70]

The COH replies that

Plaintiff has provided no evidence that Assistant Chief Dobbins, who approved Plaintiff's transfer to the Juvenile Division (See, Ex. N), Captain Angelo, or Sergeant Alvarez were aware of his protected activity or harbored any retaliatory animus because of his protected activity. The evidence shows that both Captain Angelo and Sergeant Alvarez arrived in the CSAU unit after Plaintiff filed his IAD complaint and the investigation was complete. See, Ex. U and AA. Plaintiff has not provided any evidence to show that Chief Dobbins, Captain Angelo or Sergeant Alvarez were aware of his IAD complaint, or any other protected activity, and that it was a factor in any of their employment decisions.[71]

The COH's contention that there is no causal connection between plaintiff's complaint of sexual harassment and his involuntary transfer from the CSAU to Juvenile Intake because there is no evidence either that the transfer occurred within close temporal proximity to plaintiff's protected activity or that "Chief Dobbins, Captain Angelo or Sergeant Alvarez were aware of his IAD complaint, or any other protected activity, and that it was a factor in any of their employment decisions,"[72] strains credulity.

---

[70]Id. at 42.

[71]Defendant's Reply, Docket Entry No. 38, p. 7.

[72]Id.

-42-

The summary judgment record shows that plaintiff filed a
charge for sexual harassment and retaliation with the EEOC on March
31, 2017, in which he alleged that he is

> now considered to be a department "snitch" and most
> officers in the squad no longer want to work with me. .
> . . Most of the members of the squad now avoid me, . . .
> [a]nd when I need someone to go with me to interview an
> adult suspect, a witness, or a juvenile, my co-workers
> are just not available any more to go with me.  I have
> had to do several interviews of adult suspects alone,
> which is not how we typically do these interviews.  For
> safety reasons, we have always had two officers present
> when interviewing the adult suspects.[73]

On April 24, 2017, Captain Angelo sent an email to the lieutenants
in his command, including plaintiff's lieutenant, Lieutenant
Colburn, stating that "recent issues" prompted him to send the
email asking them to

> share with your respective sergeants and officers that
> whenever an investigator requests a second officer to
> assist with an interview/interrogation of a suspect, they
> are expected to assist the primary investigator.
> Although there is nothing that I have found in our SOP's
> which requires two officers to interview/interrogate
> suspects, this decision is left up to the individual
> investigator.
>
> However, what is not acceptable is for someone to request
> assistance from their fellow officer and they do not
> receive it.  The overarching theme is the safety of our
> officers and not to put our personal differences ahead of
> our mission.  The work we do in S[pecial] V[ictims]
> D[ivision] is too important to allow whatever
> disagreements we may have with each other to take over
> and dictate who we will or will not help, and I cannot
> nor will not tolerate this behavior in SVD.  The
> overwhelming majority of our officers are doing what they

---

[73]Charge of Discrimination, pp. 2-3, Exhibit B to Defendant's
MSJ, Docket Entry No. 29-2, pp. 3-4.

are supposed to, however, due to recent issues it has become necessary for me to put this directive out.[74]

Because Captain Angelo's April 24, 2017, email addresses an issue that plaintiff raised in his March 31, 2017, EEOC charge, i.e., the refusal of his co-workers to accompany him to interviews of juveniles and adult suspects, an impartial jury could reasonably infer that Captain Angelo knew about plaintiff's EEOC charge, and the "recent issues" that prompted his April 24, 2017, email was plaintiff's filing of his EEOC charge less than a month earlier.

The summary judgment record shows that after filing his EEOC charge, plaintiff began seeing an HPD psychologist who on May 31, 2017, wrote a letter to Sergeant Alvarez, which was later shared with Captain Angelo, recommending that plaintiff be placed on light duty for 45 days.  The letter explained that

> [i]n the last several months [plaintiff] has continued to experience repeated exposure to chronic and pervasive stressors in his current work environment of which he has no control.  As a result, Officer Gregg has begun to exhibit symptoms related to critical incident stress of which may have a significant impact on his occupational functioning.  Although Officer Gregg is capable and competent to conduct his assigned work duties, his current affective and cognitive resources may be temporarily compromised, thereby having the potential to negatively impact his work productivity.[75]

---

[74]Exhibit 2, Attachment D to Plaintiff's Response, Docket Entry No. 32-4, p. 4.

[75]Letter to Sergeant Shandra White from Staff Psychologist, Meagan N. Houston, and Police Administrator, Stephen Tate, Exhibit L to Defendant's MSJ, Docket Entry No. 29-12.

-44-

Based on the HPD psychologist's recommendation, plaintiff's supervisors, Captain Angelo, Lieutenant Colburn, and Sergeant Alvarez, reduced his caseload for 45 days beginning in June of 2017.[76]   Although the psychologist's letter did not expressly mention plaintiff's protected activity, an impartial jury could reasonably infer that Captain Angelo, Lieutenant Colburn, and Sergeant Alvarez were well aware that the "chronic and pervasive stressors in [plaintiff's] current work environment of which he has no control," that prompted the psychologist to recommend a 45-day period of light duty, referred to the retaliation that plaintiff was experiencing from his co-workers as a result of his protected activity and that Captain Angelo addressed in his email of April 24, 2017.

The summary judgment record also shows that on July 17, 2017, Captain Angelo wrote an email to Ann Spiegel ("Spiegel") with the HPD Chief's legal division asking that plaintiff be transferred "if he cannot resume full duties and a full caseload as a CSAU investigator."[77]   On August 4, 2017, Captain Angelo sent an email to Spiegel stating that he had met with plaintiff because the end of his 45-day light duty status was approaching. Captain Angelo wrote that

---

[76]Letter to Sergeant Shandra White from Lieutenant John Colburn, Exhibit M to Defendant's MSJ, Docket Entry No. 29-13.

[77]See July 17, 2017, Email from David Angelo, Exhibit 1, Attachment E, to Plaintiff's Response, Docket Entry No. 32-2, p. 11.

>[i]n the interest of [plaintiff] and the Department, I
>believe an expedited transfer from Special Victims
>Division is appropriate.  His reduced caseload is
>starting to effect his fellow investigators where they
>are telling their supervisor that they are also
>"stressed", although it is more out of frustration from
>them carrying a full caseload.
>
>[Plaintiff] stated he would like to go to Juvenile
>Division, Crime Stoppers, or Vice Division.  I told him
>to keep an eye out for job postings.
>
>Again, in the interest of both [the plaintiff] and SVD
>divisional operations, I am requesting [the plaintiff] be
>transferred from SVD sooner rather than later and he is
>on board with this decision.  Please keep [me] apprised
>of any decisions made on this.[78]

Captain Angelo's emails to Spiegel make it clear that he wanted plaintiff transferred not for plaintiff's benefit, but for the benefit of his division because of the discord that resulted from plaintiff's filing of his sexual harassment complaint.

A declaration of plaintiff's counsel supported by copies of emails exchanged between counsel for plaintiff and counsel for defendant, dated August 7, August 14, and August 16, show that the COH was willing to providing plaintiff a transfer that would alleviate the stress he was experiencing at CSAU, but that in exchange for such transfer, the COH wanted plaintiff to dismiss his EEOC charge, which the plaintiff refused to do.[79]

---

[78]August 4, 2017, Email from David Angelo to Ann Spiegel, Exhibit 1, Attachment E, to Plaintiff's Response, Docket Entry No. 32-2, p. 11.

[79]See Declaration of Margaret A. Harris, Exhibit 3 to Plaintiff's Response, and Attachments A and B thereto (emails between counsel for plaintiff and counsel for defendant dated
(continued...)

On September 8, 2017, Captain Angelo and Lieutenant Colburn presented plaintiff with a letter signed by Assistant Chief Dobbins informing him that he was being involuntarily transferred to HPD's Juvenile Division effected September 9, 2017.[80]   The COH acknowledges that although the transfer letter was signed by Chief Dobbins, that the transfer occurred "based on Captain Angelo's recommendations in his August 4th email."[81]  In light of the summary judgment record, plaintiff's involuntary transfer to Juvenile Intake, based on Captain Angelo's recommendation, less than one month after plaintiff's counsel informed defendant's counsel that he would not dismiss his EEOC charge in exchange for a transfer, is sufficient to establish the causal connection needed to establish a prima facie case of retaliation.

> (b)   The COH Fails to State Legitimate Non-Retaliatory Reasons for Plaintiff's Involuntary Transfer

The COH argues that "[p]laintiff's transfer to the Juvenile division was for legitimate non-retaliatory reasons," because

[o]n August 4, 2017, Plaintiff expressed his desire to transfer out of the Special Victims Division. . . .

---

[79](...continued)
August 7, August 14, and August 16, 2017), Docket Entry No. 32-5.

[80]Exhibit N to Defendant's MSJ, Docket Entry No. 29-14.  See also September 8, 2017, Email from Angelo to Dobbins and Spiegel informing them that plaintiff had received notice of transfer, Exhibit 1, Attachment G, Docket Entry No. 32-2, p. 17.

[81]Defendant's Reply, Docket Entry No. 38, p. 10.

-47-

> [Plaintiff] informed Captain Angelo that one of the
> divisions he wanted to transfer to was the Juvenile
> Division. . . . Based on [plaintiff]'s desire to leave
> the Special Victims Division and the fact that the other
> investigators were feeling stressed out and frustrated
> due to the extra case load imposed on them as a result of
> [plaintiff]'s light duty status, Captain Angelo
> recommended transferring [plaintiff] sooner rather than
> later. . . . Captain Angelo also noted that the time was
> opportune to transfer [plaintiff] because there was an
> active transfer list for the Special Victims Division
> from which they could select a replacement. . . . After
> expressing his desire to transfer, [plaintiff] did not
> apply to transfer to any division. . . . Therefore, based
> on Captain Angelo's recommendations in his August 4th
> email, [plaintiff] was involuntarily transferred to the
> Juvenile Division.[82]

Asserting that "Plaintiff does not refute [its] legitimate non-

retaliatory reasons for the disputed employment actions,"[83] and that

"Plaintiff fails to provide any evidence to refute Defendant's

position that the ratings, statistics and statements in the October

12, 2017 JPR are consistent with the performance observed during

the rating period,"[84] the COH argues that

> Plaintiff cannot show that any of the legitimate non-
> retaliatory reasons proffered by the City are pretextual,
> nor can Plaintiff show that there was another position
> within one of the divisions he desired that was
> available.   Instead, Plaintiff falsely claims that
> Captain Angelo relied on Plaintiff's light duty status as
> one reason for his transfer with the knowledge that
> Dr. Houston of HPD Psychological Services attributed
> Plaintiff's need for light duty to the alleged
> retaliation he was experiencing. . . . This is pure
> fiction, as there is no communication from Dr. Houston

---

[82]Defendant's MSJ, Docket Entry No. 29, p. 32.

[83]Defendant's Reply, Docket Entry No. 38, p. 9.

[84]Id.

that identifies Plaintiff's allegations of retaliation as the cause for her recommendation of light duty status.[85]

For the reasons explained in § III.D.2(a)(2), above, pursuant to which the court has already concluded that plaintiff has cited evidence from which a reasonable jury could conclude that a causal connection exists between plaintiff's protected activity of complaining of sexual harassment and his involuntary transfer to Juvenile Intake, the court concludes that a reasonable jury could conclude that the COH's stated reasons for plaintiff's transfer are not legitimate, non-retaliatory reasons but, are instead, reasons that would not have existed but for plaintiff's protected activity of filing complaints of sexual harassment. Accordingly, the COH's MSJ on plaintiff's retaliation claim will be denied.

## IV. Conclusions and Order

For the reasons stated in § III.B, above, the court concludes that the COH is not entitled to summary judgment based on limitations. For the reasons stated in § III.C, above, the court concludes that the COH is not entitled to summary judgment on plaintiff's claim for hostile work environment based on sex. For the reasons stated in § III.D, above, the court concludes that the COH is not entitled to summary judgment on plaintiff's claim for

---

[85]Id. at 10-11.

retaliation.  Accordingly, Defendant's Motion for Summary Judgment, Docket Entry No. 29, is **DENIED.**

The court concludes that this action is appropriate for mediation.  If the parties are unable to settle this case within the next thirty (30) days, they will provide the court with the name and contact information of an agreed upon mediator, or request that the court refer the case to Magistrate Judge Christina A. Bryan for a settlement conference.

**SIGNED** at Houston, Texas, on this 5th day of February, 2021.

_____

SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE